**CIBRAN ENTERPRISES, INC., Plaintiff,**

v.

**BP PRODUCTS NORTH AMERICA, INC. f/k/a Amoco Oil Company, Defendant.**

No. CIV03–60069.

United States District Court, S.D. Florida, Miami Division.

Feb. 24, 2005.

Moises Melendez of Gordon Hargrove & James, P.A., Ft. Lauderdale, FL, is counsel for BP.

Bernard L. Egozi of Isicoff Ragatz & Koenigsberg, P.A., in Miami is counsel for Cibran Enterprises, Inc.

## ORDER ON PENDING MOTIONS

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on the following motions: Defendant, BP Products North America, Inc.'s ("BP['s]") Motion for Summary Judgment [D.E. 57]; Motion to Strike Jury Demand [D.E. 67]; Motion to Strike Claim for Punitive Damages, or Alternatively, for a Bifurcated Trial [D.E. 69]; and Plaintiff, Cibran Enterprises, Inc.'s ("Cibran['s]") Motion for Leave to File Surreply [D.E. 116]. On August 26, 2004, Cibran filed a Verified Second Amended Complaint [D.E. 83], alleging breach of contract, breach of the duty of good faith and fair dealing, and fraud in the inducement. BP now moves for summary judgment, arguing that no contract (and consequently no duty of good faith and fair dealing) existed between it and Cibran. Furthermore, BP argues that Cibran has failed to establish that BP breached any contract or duty and that no recoverable damages were caused by any alleged breach. Finally, BP argues that Cibran has failed to establish the elements of fraud and that Cibran's claim is based on an unenforceable "agreement to agree" and is barred by the statute of frauds. The Court heard oral argument on October 8, 2004 and has considered the parties'

written submissions, the record, and the applicable law.

## I. *FACTUAL BACKGROUND*

Cibran is a Florida corporation with a principal place of business in Florida. Its sole officer and shareholder is Mariano Cibran. BP is a Maryland corporation with a principal place of business in Illinois. It is the successor to Amoco Oil Company ("Amoco") pursuant to a merger with BP Exploration & Oil, Inc. and a subsequent name change in 2001.[1]

On September 9, 1987, BP (then known as Amoco) entered into a lease (the "Ground Lease" [D.E. 58 Ex. 15]) under which BP pays monthly rent for approximately 0.7713 acres of land in Broward County, Florida (the "Land"). The original lease term ended on August 31, 1990, but BP has the option to extend the Ground Lease for up to seven successive periods of three years each. (Ground Lease ¶ 2.) The Ground Lease also gives BP the option to purchase the Land for a price ranging from $550,000 during the first lease term up to $923,000 during the seventh renewal period. (*Id.* ¶ 17.)

In addition to the Ground Lease, BP owns certain fixed assets and equipment (the "BP Assets") used in the operation of a gasoline service station on the Land (the "Jacaranda Station"). An unsigned Assignment and Assumption of Lease describes the BP Assets as including "all buildings erected on the real estate, the pump-island canopy, underground storage tanks and lines," and other equipment. (Assign. & Assump. of Lease [D.E. 58 Ex. 8] at 1.)

On October 28, 1998, BP entered into two four-year agreements with Jay Weinstock regarding the operation of the Jacaranda Station: a Commission Marketer Agreement ("CMA" [D.E. 83 Ex. A]) and Lease Agreement ("CML" [D.E. 83 Ex. B]). Under the terms of the CML, Mr. Weinstock paid monthly rent to lease certain premises to be used as a food shop and carwash adjacent to a parcel of land to be used as a motor fuel sales facility (the "Fuel Facility"). (CML at 1, Attach. 3.) Mr. Weinstock operated the Fuel Facility according to the terms of the CMA, but the CML expressly excluded the Fuel Facility from the premises that Mr. Weinstock leased. (*Id.* at 1.) Similarly, the CMA states that "Marketer [Mr. Weinstock] agrees that it shall have no right, privilege or interest in or to the Fuel Facility or the property on which the Fuel Facility is located or in the business or goodwill of Amoco by virtue of this Agreement." (CMA at 10.)

Under the CMA, Mr. Weinstock acted as an independent contractor "to dispense motor fuels at the Fuel Facility in the name and on behalf of Amoco and furnish services related thereto." (*Id.* at 1.) The CMA provided that BP would supply the fuel and the equipment necessary to dispense the fuel at the Fuel Facility, and "[a]ll inventories of motor fuels shall be owned by Amoco and shall be dispensed by Marketer on behalf of Amoco at retail prices established by Amoco." (*Id.*) Accordingly, Mr. Weinstock was required to periodically perform "motor fuel street price surveys, record and transmit the survey information and make sign and system price changes in the manner and at the times established by Amoco from time to time." (*Id.* at 4.) Mr. Weinstock's sole compensation under the CMA was a commission fee of 7.5¢ per gallon of motor fuel sold at the Fuel Facility. (*Id.* at 3.)

---

1. Throughout this Order. "BP" and "Amoco" are used interchangeably to refer to the Defendant.

The CMA and CML contain many similar provisions. For example, the CML states that "[i]f Tenant presents Amoco with NSF [not sufficient funds] checks on two (2) or more occasions within any twelve (12) month period during the term of this Agreement, Amoco may terminate this Agreement." (CML at 2.) Similarly, both the CMA and CML provide that "giving one or more insufficient funds checks" is grounds for BP to terminate or not renew the agreements "upon 90 days written notice or such shorter notice as is reasonable under the circumstances or otherwise required by state law." (CMA at 7–8; CML at 10.)

Both the CMA and CML contain similar assignment and right-of-first-refusal provisions. For example, the CMA provides the following:

> Marketer shall have the right to assign this Agreement after first obtaining the written consent of Amoco, which consent shall not be unreasonably withheld. . . .

> Amoco shall have a right of first refusal to purchase or otherwise acquire Marketer's interest in this Agreement and/or Marketer's business as related to this Agreement on the same terms and conditions as set forth in any contract entered into by Marketer in any bona fide arms-length transaction. . . . Amoco or its assignee shall have thirty (30) business days (i.e., Monday through Friday, excluding all state and federal holidays) from the receipt of fully executed copies of all contracts and related agreements between Marketer and the proposed purchaser and all additional information requested by Amoco to exercise its right of first refusal hereunder. . . .

> If Amoco does not elect to exercise its right of first refusal within the time period provided herein, Marketer may assign this Agreement if Marketer obtains Amoco's prior written consent, which shall not be unreasonably withheld. . . .

> Marketer is the sole owner of the business operations regarding the Fuel Facility and shall not sell, assign or otherwise permit the change of any legal or beneficial interest in said business, including, but not limited to, any sale, conveyance, transfer or assignment of any such interest to a corporation, limited liability company or partnership owned or controlled by Marketer, without the express written consent of Amoco.

(CMA at 11.) The CML contains similar provisions. (CML at 8–9.)

The CMA and CML also both contain similar merger and no-oral-modification clauses. Specifically, the CMA states the following:

> This Agreement and the [CML] cancel and supersede all prior written and unwritten agreements and understanding between the parties pertaining to the Facility. No obligation, agreement or understanding shall be implied from any course of dealing or from any of the terms and provisions of the Agreement or the [CML], all obligations and understandings with respect to the subject matter hereof being expressly set forth in this Agreement and [CML]. No representations or statements other than those expressly set forth herein have been relied upon by the parties in entering into this Agreement. No modification or amendment of the terms of this Agreement shall be effective unless reduced to writing and signed by an authorized representative of each party.

(CMA at 12; *see also* CML at 14.)

In fall of 2000, Mariano Cibran and Mr. Weinstock entered into a Business Asset Sale and Purchase Agreement dated September 12, 2000 [D.E. 58 Ex. 4]. Under the terms of this agreement, Mr. Weinstock

sold to Mr. Cibran "all of [Mr. Weinstock's] assets and properties pertaining to the business known as Jacaranda Amoco" in exchange for $550,000. (Bus. Asset Purch. & Sale Agrnt. ¶ 1–2.) The transaction was scheduled to close on or about November 1, 2000. (*Id.* ¶ 4.)

The September 12, 2000 Business Asset Sale and Purchase Agreement gave Mr. Cibran ten business days following the execution of the agreement "to inspect the assets and records of [Mr. Weinstock] and other aspects of the business that [Mr. Cibran] deems pertinent." (*Id.* ¶ 12.) If Mr. Cibran was not satisfied, he had the "right to cancel this Agreement for any reason and receive a return of the deposits paid." (*Id.*) Mr. Cibran testified in his deposition that the parties extended this initial inspection period. (Cibran Dep. I [D.E. 58 Ex. 20] at 182.) Mr. Cibran also submitted a Second Addendum to Business Asset Sale and Purchase Agreement [D.E. 86 Ex. 3] which states the following:

> Because of issues that came up during the inspection of the property during the Inspection Period as described in Paragraph 12 of the BUSINESS ASSET SALE AND PURCHASE AGREEMENT, SELLER and PURCHASER agreed that PURCHASER must meet with representatives of BP/Amoco to answer certain questions concerning the property, and the inspection period was extended by the first Addendum.
>
> PURCHASER, by this Addendum, declares that the issues outstanding under the inspection period are can [sic] only be answered by BP/Amoco and are:
>
> 1. Whether the underground tanks are double walled and meet 2009 standard.
> 2. What will happen when the current lease expires in approximately two years, and what are the PURCHASER'S options upon expiration of the lease.

(Second Addendum at 1.) The Second Addendum is signed by Mr. Cibran and dated October 4, 2000 but is not signed by Mr. Weinstock. (*Id.*)

Mr. Cibran stated in his deposition that purchasing Mr. Weinstock's rights in the CMA and CML would only be financially worthwhile if he could also acquire BP's rights in the Ground Lease and BP Assets. Otherwise, Mr. Cibran testified, "[t]he numbers don't add up. It's very simple. I would lose $50,000. According to Jay [Weinstock]'s financials, I would lose $50,000." (Cibran Dep. I at 215.) Mr. Cibran explained, "I wanted to buy the land and the assets and I wanted to know if it was available to me or would be available to me in the two years [remaining under the CMA and CML]." (*Id.* at 113.) He therefore requested a meeting with a BP representative, and in late October 2000, he met with Kathleen Bennet, a BP Regional Account Executive, to discuss the transaction with Mr. Weinstock. (*Id.* at 109–10.)

The meeting with Ms. Bennet took place at a Denny's-style restaurant and lasted for approximately thirty to forty-five minutes. (*Id.*) Mr. Cibran testified that during the meeting, Ms. Bennet told him that BP would give him "the option to purchase the land and the assets of that station." (*Id.* at 114.) According to Mr. Cibran, "she told me I would have the option to buy the land and the assets." (*Id.* at 115.) Mr. Cibran explained that "[i]t would be extended to me within the first two years." (*Id.* at 114.)

On November 29, 2000, BP, Mr. Weinstock, and Mr. Cibran entered into a Commission Marketer Transfer Agreement [D.E. 58 Ex. 3]. Pursuant to this agreement, BP consented to Mr. Weinstock's transfer of all right, title, and interest in the CMA, CML, and related agreements (collectively, the "CM Agreements") to Mr.

Cibran. (Comm. Mktr. Trans. Agmt. at 2.) A condition of the agreement was that Mr. Cibran "enter into a continuing Guarantee and Assumption of Obligations ... agreeing to be bound individually by the [CM Agreements]." (*Id.*)

In November 2000, Mr. Cibran assumed Mr. Weinstock's role as the operator of the Jacaranda Station. For the first few months of operation, Mr. Cibran stated that "everything was fine." (Cibran Dep. I at 91.) Starting in April or May 2001, however, BP began to set the price of gasoline at the station "way over the rest of the competition." (*Id.*) Based on his market price surveys, Mr. Cibran believed that BP was consistently setting the price of gasoline at the Jacaranda Station five to six cents per gallon above the most expensive competitor in the local area. (*Id.* at 93.) Mr. Cibran testified, "I felt that I was priced higher than the surrounding competitors. And since I wasn't competitive myself, I started to lose business." (Cibran Dep. II [D.E. 58 Ex. 21] at 51.) Consequently, in May 2001, Mr. Cibran put his interest in the Jacaranda Station up for sale. (*Id.* at 53.)

In the summer of 2001, Mr. Cibran and a business broker, Joel Bowie, met with Luis Laboy of BP and Randy Rufrano of RNG Petroleum, Inc. ("RNG") to discuss a three-part transaction. (*Id.* at 62–63.) Part one of this transaction, as evidenced by a Business Asset Sale and Purchase Agreement dated July 12, 2001 [D.E. 58 Ex. 6], entailed Mr. Cibran selling his rights in the Jacaranda Station to RNG for $620,000. Part two, described in a Letter of Intent dated August 28, 2001 [D.E. 58 Ex. 7], called for BP to sell the BP Assets to RNG for $550,000. Part three, also described in the August 28, 2001 Letter of Intent, made the entire transaction contingent on RNG's being able to purchase the Land for $713,000. According to Mr. Rufrano, at no time was RNG willing to go forward with the purchase of Mr. Cibran's rights in the Jacaranda Station without also being able to purchase the BP Assets and the Land. (Rufrano Dep. [D.E. 58 Ex. 24] at 30.)

On August 1, 2001, Mr. Bowie faxed a copy of the July 12, 2001 Business Asset Sale and Purchase Agreement to Ms. Bennet and stated: "Our hope is that we can get from Amoco an agreement to sell the assets (station, tanks, etc.) and assign their rights under the land lease to RNG Petroleum." (Fax Cover Sheet of Aug. 1, 2001 [D.E. 58 Ex. 6].) According to documents submitted by BP, the parties then engaged in negotiations, and the terms of the deal varied over time. For example, an August 28, 2001 Letter of Intent, addressed to Mr. Laboy and signed by Mr. Rufrano, called for BP to sell the BP Assets to RNG for $550,000. (Letter of Intent of Aug. 28, 2001 at 1.) Subsequently, an unsigned Assignment and Assumption of Lease (which according to the accompanying Transmittal Cover Sheet, was originally faxed from Mr. Laboy to Mr. Rufrano on October 4, 2001) indicates that BP would assign its rights under the Ground Lease and sell the BP Assets to RNG in exchange for $695,000. (Transmittal Cover Sheet of Oct. 4, 2001 [D.E. 58 Ex. 8]; Assign. & Assump. of Lease at 1.) Then, on November 13, 2001, Mr. Bowie faxed to Mr. Laboy an Addendum to the July 12, 2001 Business Asset Sale and Purchase Agreement [D.E. 58 Ex. 9], indicating that Mr. Cibran was now willing to sell his rights in the Jacaranda Station to RNG for $550,000.

On September 26, 2001, BP sent Mr. Cibran a letter indicating that it was terminating the CM Agreements effective January 24, 2002 due to, among other things, a third "incident in which a draft for the gross receipts from the sale of motor fuels was returned to Amoco due to

insufficient funds." (Letter to Mariano Cibran of Sept. 26, 2001 [D.E. 58 Ex. 11] at 1.) Mr. Cibran admitted in his deposition that there were twelve occurrences during his operation of the Jacaranda Station in which he had insufficient funds in his account to cover drafts to BP. (Cibran Dep. II at 168–72.)

On December 14, 2001, BP sent RNG a letter [D.E. 58 Ex. 10] terminating its offer to assign its rights under the Ground Lease and sell the BP Assets to RNG for $695,000. Gus Santoro, an employee of RNG, testified in his deposition that Mr. Laboy called him to tell him that BP did not want to do the deal anymore because there were "some unresolved issues with Mariano [Cibran]." (Santoro Dep. [D.E. 58 Ex. 25] at 27.)

On January 10, 2002, Mr. Cibran's attorney, L. Gregory Loomar, sent a letter to Joan Zwit, an attorney for BP, stating the following:

> I am requesting that your company consent to my client's sale of its business interests in the business known as "Jacaranda Amoco" ... and that the transaction be consummated either contemporaneously with your company's sale of the business assets or independently from that transaction....
>
> ... I will require that your client retract its claim of default against my client and agree not to terminate my client from the Lease Agreement prior to the closing of the transaction.

(Letter to BP of Jan. 10, 2002 [D.E. 58 Ex. 13] at 1.)

Ms. Zwit responded to Mr. Loomar in a letter dated January 15, 2002, stating that BP "hereby rejects your client's proposal for the following reasons.... RNG Petroleum was in possession of a written contract but did not act in a timely manner. In addition, BP terminated your client's agreements based on numerous drafts for insufficient funds." (Letter to L. Gregory Loomar of Jan. 15, 2002 [D.E. 58 Ex. 14] at 1.)

On January 22, 2002, BP sent Mr. Cibran a letter reminding him that the CM Agreements would be terminated on January 24, 2002. (Letter to Mariano Cibran of Jan. 22, 2002 [D.E. 58 Ex. 12] at 2.) The letter also stated that "on Friday, January 18, 2002, [Mr. Cibran's] Retail Account Executive, Joe Eikenberg, visited the Service Station and discovered that the electricity had been turned off and that the pumps had signage stating, 'No Electricity.' " (*Id.* at 1.) Mr. Cibran stated in his deposition that he did not know whether there was any activity at the Jacaranda Station after January 22, 2002. (Cibran Dep. II at 200–01.)

Cibran, the corporation, brought this action on January 17, 2003. In its Verified Second Amended Complaint, Cibran alleges breach of contract, breach of the duty of good faith and fair dealing, and fraud in the inducement. Specifically, Cibran claims that it purchased Mr. Weinstock's interest in the CM Agreements in reliance on Ms. Bennet's false statements that it would have the right to purchase the BP Assets and the Land. Cibran also claims that BP put it out of business by setting retail gasoline prices at uncompetitive rates. Finally, Cibran argues that BP unreasonably withheld its consent to the proposed sale of Cibran's interests in the Jacaranda Station to RNG.

BP now moves for summary judgment, arguing that Cibran lacks standing to bring a claim for breach of the CM Agreements because it is not a party to the September 12, 2000 Business Asset Sale and Purchase Agreement nor the November 29, 2000 Commission Marketer Transfer Agreement. BP also argues that it is not liable for breach of the CM Agreements because, even if it unreasonably withheld its consent to RNG's purchase of

Mr. Cibran's interest in the Jacaranda Station, its conduct caused Mr. Cibran no damages. It states this because RNG was not willing to proceed with the transaction unless it could also purchase BP's rights in the BP Assets and the Ground Lease, which BP was not obligated to sell. BP also contends that rather than putting Mr. Cibran out of business, it took over the Jacaranda Station due to a lawful termination of the CM Agreements following twelve instances of insufficient funds. Finally, BP argues that Mr. Cibran's fraud claim is barred by the statute of frauds, concerns an unenforceable "agreement to agree," and is based on statements that were unreasonable to rely upon as a matter of law.

## II. *LEGAL STANDARD*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir.1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.

## III. *ANALYSIS*

### A. Privity of Contract & Substitution of Parties

Mr. Cibran, in his individual capacity, entered into the Business Asset Sale and Purchase Agreement dated September 12, 2000 with Mr. Weinstock and the Commission Marketer Transfer Agreement dated November 29, 2000 with BP and Mr. Weinstock. (*See* Cibran Dep. I at 181, 207.)

On November 28, 2000, Mr. Cibran executed an Assignment of Contract [D.E. 86 Ex. 7] which purports to assign and transfer all of his right, title, and interest in the September 12, 2000 Business Asset Sale and Purchase Agreement to Mr. Cibran's wholly owned corporation, Cibran. The CMA, however, states that the Marketer "shall not sell, assign or otherwise permit the change of any legal or beneficial interest in said business, including, but not limited to, any sale, conveyance, transfer or assignment of any such interest to a corporation, limited liability company or partnership owned or controlled by Marketer, without the express written consent of Amoco." (CMA at 11.) The CML contains a similar provision. (CML at 9.)

There is no evidence in this case that BP gave its express written consent to Mr. Cibran's assignment of his rights in the Jacaranda Station to his wholly owned corporation. BP therefore argues that the assignment was invalid and that Cibran (the corporation), which is the only plaintiff in this case, lacks standing to sue for breach of the CM Agreements.

■■■ "Generally, contract rights can be assigned unless they involve obligations of a personal nature or there is some public policy against the assignment or such assignment is specifically prohibited by the contract." *New Holland, Inc. v. Trunk,* 579 So.2d 215, 217 (Fla. 5th DCA 1991) (citation omitted). In this case, assignment is specifically prohibited as the CMA and CML clearly prohibit assignment without BP's written consent. Furthermore, the CMA involves obligations of a personal nature. It provides that "[t]he undersigned individual [the Marketer] shall devote his or her personal effort and attention to managing the business at the Fuel Facility and shall be physically present at the Fuel Facility for reasonable periods of time ...." (CMA at 2.) Accordingly, the November 28, 2000 assignment

of Mr. Cibran's rights in the Jacaranda Station to Cibran without BP's written consent was ineffective.

■■■ "It is elementary that a person not a party to nor in privy with a contract does not have the right to sue for its breach." *White v. Exchange Corp.,* 167 So.2d 324, 326 (Fla. 3d DCA 1964) (citations omitted). As the November 28, 2000 assignment to Cibran was ineffective, Cibran lacks standing to sue for breach of the CM Agreements. Cibran argues, however, that the Court should allow it to substitute Mr. Cibran, in his individual capacity, as the Plaintiff in this action.

■■■ Leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.— the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Federal Rules of Civil Procedure also provide that

> [n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Fed.R.Civ.P. 17(a).

■■■ "A Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way

alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 20 (2d Cir.1997). In *Advanced Magnetics,* for example, a corporation brought suit partially in its own right and partially as the assignee of its shareholders' rights. *Id.* at 14. The court concluded that the attempted assignment was insufficient to transfer the shareholders' claims to the corporation, and therefore, the corporation could not sue on the claims in its name. *Id.* at 18. Nevertheless, the court ruled that leave to amend the complaint, substituting the individual shareholders as plaintiffs to pursue their own claims, should have been granted under Rule 17(a). *Id.* at 21. In reaching this conclusion, the court found that the individual shareholders' claims were sufficiently asserted in the original complaint, which identified them by name and identified the defendant's alleged wrongful conduct. *Id.* at 20. "The complaint's only pertinent flaw was the identity of the party pursuing those claims . . . ." *Id.*

Similarly, in this case, Cibran acted under an ineffective assignment of rights and brought suit on claims that its shareholder, Mr. Cibran, should have brought in his individual capacity. Like the individual shareholders in *Advanced Magnetics,* Mr. Cibran should be allowed to join the suit as a party-plaintiff because the pertinent flaw in Cibran's Verified Second Amended Complaint (as it pertains to this issue) is merely the identity of the party pursuing the claims. In this case, the Verified Second Amended Complaint identifies Mr. Cibran by name and sets out the conduct that Mr. Cibran alleges caused damages. BP was therefore given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

There is no evidence that Cibran or Mr. Cibran acted in bad faith in bringing this action in Cibran's corporate name, rather than in Mr. Cibran's individual capacity. Furthermore, BP will not suffer undue prejudice by allowing Mr. Cibran to join the action given that BP has been on notice of his claims and has conducted full discovery related to the issues of this case, including a two-day deposition of Mr. Cibran. Mr. Cibran is therefore allowed to file a notice of consent to join the action as a party-plaintiff under Federal Rule of Civil Procedure 17(a), which shall have the same effect as if the action had been originally commenced in his name. The remainder of this Order considers Mr. Cibran, in his individual capacity, to be the Plaintiff in this action and dismisses Cibran in its corporate capacity.

## B. Fraud in the Inducement

█ Mr. Cibran argues that Ms. Bennet made false statements which induced him to go forward with the September 12, 2000 Business Asset Sale and Purchase Agreement and enter into the November 29, 2000 Commission Marketer Transfer Agreement. Specifically, Mr. Cibran contends that Ms. Bennet falsely told him that he would have the right to purchase the BP Assets and the Land during the two years that remained under the CM Agreements if he purchased Mr. Weinstock's rights in the Jacaranda Station. Mr. Cibran claims that Ms. Bennet's statements were false when she made them and that as a result, he invested and lost $550,000.

 To establish fraud in the inducement, Mr. Cibran must prove the following elements by clear and convincing evidence:
(1) A misrepresentation of a material fact;
(2) The representor of the misrepresentation, knew or should have known of the statement's falsity;

(3) Intent by the representor that the representation will induce another to rely and act on it; and

(4) Resulting injury to the party acting in justifiable reliance on the representation.

*Lou Bachrodt Chevrolet, Inc. v. Savage,* 570 So.2d 306, 308 (Fla. 4th DCA 1990) (citations omitted). As to the fourth element, "reliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement." *Eclipse Medical, Inc. v. American Hydro–Surgical Instruments, Inc.,* 262 F.Supp.2d 1334, 1342 (S.D.Fla.1999) (citing *Barnes v. Burger King Corp.,* 932 F.Supp. 1420, 1428 (S.D.Fla.1996); *Acquisition Corp. of Am. v. FDIC,* 760 F.Supp. 1558, 1561 n. 6 (S.D.Fla.1991)), *aff'd,* 235 F.3d 1344 (11th Cir.2000) (unpublished table decision). "Indeed, fraudulent inducement claims will fail even where the subsequent contract simply says nothing about the allegedly false promise." *Id.*

In this case, Ms. Bennet allegedly made her false promise during a meeting with Mr. Cibran in October 2000. In November 2000, Mr. Cibran, Mr. Weinstock, and Ms. Bennet signed the Commission Marketer Transfer Agreement, which states that "[t]his Agreement, the attachments hereto and to documents referred to herein, constitute the *entire agreement* among the parties with respect to the subject matter hereof. No amendment shall be binding unless in writing and signed by the party against whom enforcement is sought." (Comm. Mktr. Trans. Agmt. at 3–4 (emphasis added).) The agreement also provides that "[a]ny terms or conditions of the purchase and sale between [Mr. Weinstock] and [Mr. Cibran] which may purport to bind Amoco shall not be valid and binding on Amoco unless agreed to by Amoco in writing." (*Id.* at 3.)

Mr. Cibran stated in his deposition that Ms. Bennet's promise that BP would sell him the BP Assets and assign him BP's option to purchase the Land was a condition of his purchasing Mr. Weinstock's interest in the Jacaranda Station. (Cibran Dep. I at 215.) Mr. Cibran admitted, however, that there is no writing evidencing the promise. (*Id.* at 176.) BP is therefore entitled to summary judgment on Mr. Cibran's fraud in the inducement claim. A material condition of Mr. Cibran's purchase from Mr. Weinstock, which purports to bind BP, was not reduced to writing and signed by BP as required by the Commission Marketer Transfer Agreement. It was unreasonable as a matter of law for Mr. Cibran to rely on Ms. Bennet's alleged oral promise when the subsequent writing, representing the "entire agreement among the parties," expressly required any such promise to be in writing. (Comm. Mktr. Trans. Agmt. at 3.)

■ Furthermore, as discussed below, Ms. Bennet's alleged oral promise to sell the BP Assets at an undetermined price at some point during the next two years is unenforceable as an oral contract. The Court has previously ruled in this case that BP's alleged "fraud cannot be the basis of a fraud in the inducement action if the underlying contract is unenforceable." (Order on BP Products North America, Inc.'s Motion to Dismiss Count III of Plaintiff's Amended Complaint [D.E. 74] at 23.) Therefore, Mr. Cibran's claim for fraud in the inducement must also fail to the extent it is based on an alleged oral promise to sell him the BP Assets at an undetermined price in the future.

**C. Breach of Contract**

■ Mr. Cibran claims that BP breached the CM Agreements by unreasonably withholding its consent to the proposed sale of his rights in the Jacaranda

Station to RNG. Under the CMA and CML, if BP elected not to exercise its right of first refusal, Mr. Cibran could assign his rights to a third party upon obtaining BP's prior written consent, "which shall not be unreasonably withheld." (CMA at 11; CML at 9.) Mr. Cibran contends that BP unreasonably withheld its consent to the transaction with RNG, causing him to suffer damages equal to the lost proceeds from the RNG sale.

 "The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Abbott Labs., Inc. v. GE Capital*, 765 So.2d 737, 740 (Fla. 5th DCA 2000) (citations omitted). "In breach of contract actions, a plaintiff may recover only if the damages were a proximate result of the breach." *Chipman v. Chonin*, 597 So.2d 363, 364 (Fla. 3d DCA 1992) (citing *Tuttle/White Constructors, Inc. v. Montgomery Elevator Co.*, 385 So.2d 98 (Fla. 5th DCA 1980)).

 In this case, Mr. Cibran's damages (the lost proceeds from the RNG sale) were not a proximate result of any breach by BP. The proposed RNG transaction consisted of three parts. Mr. Rufrano testified that RNG was not willing to go forward with the purchase of Mr. Cibran's rights in the Jacaranda Station (part one) without also being able to purchase the BP Assets and the Land (parts two and three). (Rufrano Dep. at 30.) As discussed below, BP never had an obligation to sell the BP

Assets. Therefore, when BP terminated its offer to sell the BP Assets on December 14, 2001, any possibility that Mr. Cibran would receive proceeds from the RNG sale ended. It made no difference whether or not BP acted unreasonably in withholding its consent to Mr. Cibran's proposed assignment of his rights to RNG; RNG was not willing to pay for those rights once BP decided not to sell its assets, a decision BP had every right to make.[2]

Mr. Cibran contends, though, that BP's refusal to consent to the RNG sale was unreasonable precisely because BP, acting through Ms. Bennet, had already committed to disposing of its assets in order to induce him to enter into the original transaction with Mr. Weinstock. However, the undisputed facts show that BP had no obligation to sell its assets. Mr. Cibran admits that there is no written contract evidencing BP's promise to sell its assets, and as discussed above, the Commission Marketer Transfer Agreement states that it represents the "entire agreement among the parties" and any terms or conditions "which may purport to bind Amoco shall not be valid and binding on Amoco unless agreed to by Amoco in writing." (Comm. Mktr. Trans. Agmt. at 3.)

 Furthermore, no oral contract existed between BP and Mr. Cibran obligating BP to sell the BP Assets. In Florida, the statute of frauds bars an action on

---

**2.** Mr. Cibran also raises the possibility that if BP had acted more quickly in terminating negotiations with RNG, he may have been able to find another purchaser who was willing to purchase his rights alone without also acquiring the BP Assets or the Land. However, as early as September 26, 2001, BP notified Mr. Cibran that it was terminating the CM Agreements effective January 24, 2002 due to repeated occurrences of insufficient funds. Mr. Cibran submitted no evidence from which a reasonable fact-finder could conclude that he had the potential to close a

transaction with another buyer before the CM Agreements expired. He also submitted no evidence regarding what any such buyer would pay to operate the Jacaranda Station for only four months. "In Florida, unless the fact-finder is presented with evidence which will enable it to determine damages for lost profits with a reasonable degree of certainty, rather than by means of speculation and conjecture, the claimant may not recover such damages." *Himes v. Brown & Co. Sec. Corp.*, 518 So.2d 937, 938 (Fla. 3d DCA 1987) (citations omitted).

a contract for the sale of lands "or of any uncertain interest in or concerning them," Fla. Stat. § 725.01, or for personal property in excess of $5,000, *id.* § 671.206, unless there is a writing signed by the party against whom enforcement is sought. Also under Florida law, an agreement is unenforceable if the terms "are so vague, indefinite, uncertain and incomplete, that it is impossible to ascertain the intent of the parties thereto." *Brown v. Dobry,* 311 So.2d 159, 160 (Fla. 2d DCA 1975). For example, in *Drost v. Hill,* the court concluded that an option to lease property, which was to include an option to buy the property, was unenforceable when "the parties had not reached a meeting of the minds on a material term, namely, the price at which the landlord would sell, and the tenants would buy, the property." 639 So.2d 105, 106 (Fla. 3d DCA 1994).

In his deposition, Mr. Cibran testified about the terms of Ms. Bennet's promise that he would have the option to buy the Land and the BP Assets in the two years remaining under the CM Agreements:

Q And so what did you have to do then within those two years to make that a reality? Did you talk about that?

A Just like you'd buy any other piece of property where you had to do.

Q What is that?

A You had to go ahead, look into it, get the prices straight and close on it.

Q Meaning the terms of the deal had to be worked out?

A Correct. Check the terms, whatnot. Exact, you know, dollar figures, closing dates, all of those matters.

Q All the issues had to be worked out in the future; is that fair?

A Closing times, where to meet and all that, yes. Closing parties, closing. That had to be, that obviously—

Q How much money—

A Correct.

Q —it would cost?

A Correct.

. . . . .

Q So is it fair to say that those terms, price, timing, any of the details with respect to this possibility in the future—

A Yes.

Q —still had to be worked out; is that fair to say?

A Yes.

(Cibran Dep. I at 116–17.) Mr. Cibran further testified regarding his understanding of how much it would cost him in the future to exercise his option:

Q Give me the approximate price you believed it would cost you to buy the assets that you described, the building, tanks, lines, canopy and carwash structure.

A Is that including the business or not including the business?

Q Not including the business. Just the assets.

A Million and a half, two-million.

. . . . .

Q Okay. And what did you understand the cost to you would be for the sale of Amoco's ground lease to you?

A Well, what someone would have told me it would be.

Q I want to know your understanding, because you said you had a general idea.

A Several hundred thousand dollars. Between six and eight. That was— you got to understand now, I didn't know that Amoco had a ground lease with anybody else. I thought they owned everything. That was the way

Kathleen portrayed it to me at the meeting.

(*Id.* at 121–22.)

The undisputed facts show that Mr. Cibran and Ms. Bennet failed to agree on a price at which BP would sell the BP Assets in the future, which is a material term of the alleged contract. *See Drost,* 639 So.2d at 106. The parties also failed to discuss other material terms inherent in the sale of buildings, underground storage tanks, lines, and equipment used in the operation of a gasoline station. *See Midtown Realty v. Hussain,* 712 So.2d 1249, 1252 (Fla. 3d DCA 1998) ("The proposal in this case dealt with the sale of a gas station, a complex situation that includes environmental concerns, the attainment of licenses and government approval, and the financing of a large sum of money, among other things.") Finally, Mr. Cibran admitted that BP never signed a writing evidencing a contract to sell the BP Assets, which were worth approximately $550,000 to $695,000,[3] based on BP and RNG's negotiations.

Mr. Cibran argues, however, that the terms of BP's obligation to sell its assets were not vague or indefinite and that the statute of frauds is inapplicable because Mr. Cibran fully performed his obligation under the contract. *See W.B.D., Inc. v. Howard Johnson Co.,* 382 So.2d 1323, 1327 (Fla. 1st DCA 1980) ("When an oral contract has been fully performed by one party, the statute of frauds may not be employed as a defense, even though the subject matter of the contract is the conveyance of an interest in land.")

Mr. Cibran submitted a declaration, clarifying his understanding of BP's obligations arising from Ms. Bennet's promises during their October 2000 meeting:

[T]here were no additional terms to be negotiated between Cibran and BP with respect to the assignment of BP's contractual option to purchase the Property. . . .

In fact, BP's corporate representative, Kathleen Bennett [sic], simply promised me that if I bought the Business, Cibran would have the right to purchase the real property at the Business at any time during my proposed tenure as a Commission Marketer.

The promised purchase option was not supposed to be transferred to Cibran at some undetermined time in the future and no additional price was to be paid for this option. The only price that had to be paid for this option was $550,000 to Jay Weinstock.

. . . The price and terms for the eventual purchase of the Property were already set pursuant to the terms of the Ground Lease that BP had with the owner of the Property. These terms were predetermined by the terms of the Ground Lease that my broker, Joel Bowie, obtained for me.

(Cibran Decl. [D.E. 116 Ex. A] at 2.) Although Mr. Cibran was unaware of the existence of the Ground Lease at the time he spoke with Ms. Bennet, he argues that BP transferred its option to purchase the Land, the details of which are fully set out in the Ground Lease, solely in exchange for his paying Mr. Weinstock $550,000, which he did.

However, Mr. Cibran only addresses the option to purchase the Land. He does not provide any evidence that he and BP reached agreement on the terms of a future sale of the BP Assets. As discussed above, the sale of the BP Assets was an integral part of the proposed RNG trans-

---

**3.** As quoted, Mr. Cibran stated in his deposition that be expected to pay between $1.5 million and $2 million for the BP Assets. (Cibran Dep. I at 121–22.)

action. BP's alleged promise to sell the BP Assets is not evidenced by a signed writing and lacks a material term—the price. Therefore, contrary to Mr. Cibran's assertion, BP's refusal to consent to the RNG sale was not unreasonable due to BP's violation of a preexisting commitment to dispose of its assets; such a commitment did not exist.

## D. Good Faith and Fair Dealing

### 1. Proof of Breach

■■■■ "Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract." *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1315 (11th Cir.1999) (citations omitted). " 'It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure.* '" *Id.* (quoting *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414, 1429 (11th Cir.1990)).

■■■■ The "duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Hospital Corp. of America v. Florida Med. Ctr.,* 710 So.2d 573, 575 (Fla. 4th DCA 1998). "Rather than serving as an independent term within a contract, the implied covenant 'attaches ... to the performance of a specific contractual obligation.' " *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1291 (11th Cir. 2001) (quoting *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1314 (11th Cir.1998)). The Eleventh Circuit has therefore held that "no independent cause of action exists under Florida law for breach of the implied covenant of good faith and fair dealing. Where a party to a contract has in good faith per-

formed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie." *Weaver,* 169 F.3d at 1317–18.

In this case, Mr. Cibran points to two instances which, he argues, show that BP failed to perform express terms of the CMA and CML in good faith. First, Mr. Cibran argues that BP unreasonably withheld its consent to the sale of his interest in the Jacaranda Station to RNG. However, as discussed above, BP's conduct, even if unreasonable, caused Mr. Cibran no damages.

■■■■ Second, Mr. Cibran alleges that commencing in mid–2001, BP, in bad faith, set the retail price of gasoline to be sold at the Fuel Facility at a rate that was, on average, approximately five cents per gallon higher than all of Mr. Cibran's competitors in the same geographic area, including BP's corporate retail locations. Mr. Cibran recognizes that under the CMA, BP was the owner of all inventories of motor fuel and that Mr. Cibran dispensed the fuel "on behalf of Amoco at retail prices established by Amoco." (CMA at 1.) Mr. Cibran argues, however, that it was reasonable for him to expect that BP would set competitive prices, allowing him to retain customers and earn commissions.

■■■■ "With the implied covenant, one party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Ernie Haire Ford,* 260 F.3d at 1291 (citing *Sepe v. City of Safety Harbor,* 761 So.2d 1182, 1185 (Fla. 2d DCA 2000); *Cox v. CSX Intermodal, Inc.,* 732 So.2d 1092, 1097–98 (Fla. 1st DCA 1999)). Nevertheless, "the limit placed on a party's discretion is not great. As the Florida Second District Court of Appeal has stated, 'Unless no reasonable party ... would have made the same discretionary decision ..., it seems unlikely that [the party's]

decision would violate the covenant of good faith ....' "" *Id.* (alteration in original) (quoting *Sepe,* 761 So.2d at 1185).

BP asserts that Mr. Cibran has not come forward with any evidence of the specific dates on which he claims uncompetitive prices were charged, specific information about what the uncompetitive prices were, what the difference in prices should have been to be competitive, or what specific impact the difference between the uncompetitive price and the competitive price would have had on the specific dates in question. Notwithstanding the lack of specificity, a genuine issue of material fact exists regarding whether BP breached its duty of good faith and fair dealing based on the CMA's provision allowing it to unilaterally set the retail price of gasoline and Mr. Cibran's deposition testimony that BP set the price unreasonably in light of his local competition. Summary judgment on this count is therefore inappropriate.

### 2. *Recoverable Damages*

"Under Florida law, a contract plaintiff may recover damages in an amount which will place him in the position that he would have obtained but for the breach or the damages that are the natural and proximate result of the default, subject to the rules of foreseeability and certainty." *Burger King Corp. v. Mason,* 710 F.2d 1480, 1494 (11th Cir.1983) (citations omitted). The CMA and CML both provide that "[i]n no event shall either party be liable to the other for any consequential, incidental, punitive or exemplary losses or damages suffered by the other party." (CMA at 6; CML at 7.)

In this case, Mr. Cibran seeks damages of at least $620,000, representing the proceeds from the proposed RNG transaction, as originally negotiated. (Pl.'s Verif. Supp. Resp. Interrog. [D.E. 58 Ex. 17 at 3–4.) However, as discussed above, Mr.

Cibran's loss of potential proceeds from the RNG transaction was not a proximate result of BP's alleged breach of its duty of good faith and fair dealing. Therefore, no such recovery is allowed.

Additionally, Mr. Cibran claims a loss of business value of approximately $550,000, representing the purchase price that Mr. Cibran paid in 2000 for Mr. Weinstock's rights in the Jacaranda Station. (*Id.* at 4.) Mr. Cibran testified in his deposition that he originally paid Mr. Weinstock the $550,000 in exchange for certain assets at the Jacaranda Station and for cash flow from operating the business. (Cibran Dep. I at 138.) He further testified that because BP unreasonably set the retail price of fuel, his business suffered and he eventually experienced several instances of insufficient funds. (Cibran Dep. II at 221.) These instances of insufficient funds served as the basis of BP's decision to terminate the CM Agreements early, effective January 24, 2002. (Letter to Mariano Cibran of Sept. 26, 2001 at 1.)

At trial, if Mr. Cibran establishes a breach, his measure of damages will be the amount which will place him in the position that he would have obtained if BP had observed its obligation of good faith and fair dealing with respect to setting the retail price of fuel. Specifically, Mr. Cibran must prove the cash flow from operation of the Jacaranda Station that he lost as a natural and proximate result of BP's alleged breach, subject to the rules of foreseeability and certainty. If Mr. Cibran is to recover any lost cash flow from the period after January 24, 2002, he must also show that BP's decision to terminate the CM Agreements early was also a natural and proximate result of BP's alleged breach of its duty. As stated in the CMA and CML, no recovery of consequential, incidental, punitive, or exemplary damages

is allowed; therefore, only Mr. Cibran's expectation damages are recoverable.

### 3. Bench Trial

 The CMA and CML state that "[e]ach party irrevocably waives trial by jury in any action, proceeding or counter-claim, whether at law or in equity, brought by either party." (CMA at 6; CML at 7.) Therefore, Mr. Cibran's claim for breach of BP's duty of good faith and fair dealing shall proceed to a bench trial.

## IV. CONCLUSION

For all the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. BP's Motion for Summary Judgment [D.E. 57] is **GRANTED IN PART**. Summary judgment is granted in favor of BP on Count I (breach of contract) and Count III (fraud in the inducement) of the Verified Second Amended Complaint. Summary judgment is denied as to Count II (breach of the duty of good faith and fair dealing).

2. The parties shall appear for calendar call on April 12, 2005 for the two-week trial period beginning April 18, 2005. A joint pre-trial stipulation, proposed findings of fact and conclusions of law, and motions *in limine* are due March 21, 2005. The parties are reminded of the Court's Instructions for Bench Trial [D.E. 49] and Order Regarding the Use of Depositions at Trial [D.E. 50].

3. Mr. Cibran shall file a Notice of Consent to Join the Action as a Party–Plaintiff by March 11, 2005, which shall have the same effect as if the action had been originally commenced in his name. Failure to file such a Notice shall result in summary judgment being granted in favor of BP on Count II.

4. BP's Motion to Strike Jury Demand Regarding Count III of Amended Complaint [D.E. 67] and Motion to Strike Claim for Punitive Damages, or Alterna-

tively, for a Bifurcated Trial [D.E. 69], both of which are based on Count III, are **DENIED AS MOOT**.

5. Cibran's Motion for Leave to File Surreply [D.E. 116] is **GRANTED**. The Court has considered Mr. Cibran's declaration attached to the Motion.