**QANTUM COMMUNICATIONS CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**STAR BROADCASTING, INC., a Florida corporation, and Ronald E. Hale, Sr., Defendants.**

No. 05–21772–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Feb. 9, 2007.

John O'Sullivan and Jason Kellogg of Hogan & Hartson LLP in Miami were counsel for the plaintiff, Qantum Communications Corp.

Jeffrey P. Shapiro of Shapiro Ramos P.A. of Miami was counsel for the defendants, Star Broadcasting, Inc. and Ronald E. Hale Sr.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SANCTIONS

MARTINEZ, District Judge.

THIS CAUSE came before the Court upon Plaintiff's Motion for Partial Summary Judgment as to Liability (**D.E. No. 118**) ("Motion for Summary Judgment") and Plaintiff's Motion for Sanctions, In-

cluding the Entry of a Default Judgment and an Award of Attorney's Fees (**D.E. No. 117**) ("Motion for Sanctions"). The Court has carefully considered these two motions, which are fully briefed, and it is otherwise duly advised.[1] This Court held a hearing on both the Motion for Summary Judgment and the Motion for Sanctions on October 17, 2006 and heard oral argument from counsel. This case involves a commercial dispute over an agreement to purchase the assets of an FM radio station. Plaintiff alleges that Defendants breached a "No–Shop" provision of that agreement by negotiating to sell the radio station to Plaintiff's main competitor while the agreement was still in effect. Plaintiff argues that under the language of the agreement, Defendants' subsequent attempt to terminate the agreement was invalid because Defendants were in breach of the agreement at the time Defendants attempted to terminate. Plaintiff seeks specific performance to enforce the agreement, declaratory relief, damages, and injunctive relief. *See generally* (Amended Complaint, D.E. No. 87).

Plaintiff's Motion for Sanctions argues that due to a pattern of serious misconduct on the part of Defendants, including failing to produce "smoking-gun" documents during discovery, testifying falsely under oath, and putting the defendant corporation into bankruptcy in a bad-faith attempt to avoid the agreement and pending litigation, Plaintiff is entitled to the "ultimate" sanction of default judgment as to liability for all counts of the Amended Complaint, as well as reasonable attorney's fees and costs.[2] In the alternative, Plaintiff's Motion for Summary Judgment seeks judgment as to liability for Count I (Specific Performance), Count III (Declaratory Relief), and Count IV (Injunctive Relief) of the Amended Complaint.[3] Plaintiff essentially argues that this Court should find as a matter of law that the parties' agreement is enforceable, that Defendants breached the agreement, and that Defendants should be ordered to specifically perform their obligations under the agreement.

This Court addresses the Motion for Summary Judgment first and the Motion for Sanctions second.[4] For the reasons discussed in this Order, this Court finds

---

1. This Court has considered Plaintiff's Motion for Summary Judgment (D.E. No. 118); Defendants' Response in Opposition (D.E. No. 126); Plaintiff's Reply (D.E. No. 131); and Defendants' Surreply (D.E. No. 147). It has also considered Plaintiff's Motion for Sanctions (D.E. No. 117); Defendants' Response in Opposition (D.E. No. 125); Plaintiffs' Reply (D.E. No. 132); and Defendants' Surreply (D.E. No. 146).

2. Plaintiff's counsel clarified at oral argument at the hearing on October 17, 2005 that the Motion for Sanctions sought default judgment as to liability of all counts of the Amended Complaint, including Count II. (D.E. No. 162, Transcript of Hearing on Motion for Summary Judgment and Sanctions at 39:2–8).

3. Plaintiff's Motion for Summary Judgment specifically explains: "Qantum's Amended Complaint includes a breach of contract

claim (Count II) based on Defendants' failure to provide an option to lease the radio tower from which WTKE presently transmits (the "Tower"). Qantum is not seeking summary judgment with respect to that claim in this Motion." (D.E. No. 117 at 3 n. 1).

4. As is discussed *infra,* when determining an appropriate sanction pursuant to a court's inherent power, a court must balance the interest in sufficiently punishing and deterring the abusive conduct with the interest of allowing a full and fair trial on the merits. *See Richardson v. Union Oil Co. of California,* 167 F.R.D. 1, 4 (D.D.C.1996). This Court finds that by first examining the merits pursuant to Plaintiff's Motion for Summary Judgment as to liability for Count I, Count III, and Count IV, it is better able to fashion a sanction that balances these competing concerns. *See* discussion in Section III(B)(5) of this Order, *infra.*

that the Motion for Summary Judgment should be granted and that the Motion for Sanctions should also be granted. This Court first discusses the relevant factual and procedural background of this case. It then discusses Plaintiff's Motion for Summary Judgment and concludes that there is no genuine issue of material fact and that as a matter of law Plaintiff is entitled to judgment as to liability for Count I, Count III, and Count IV of the Amended Complaint. Accordingly, Plaintiff is entitled to declaratory relief, injunctive relief, and specific performance pursuant to the parties' agreement. Furthermore, this Court finds that there is clear and convincing evidence of a pattern of serious misconduct on the part of the Defendants during the course of this litigation. After careful consideration, this Court finds that Plaintiff's Motion for Sanctions should be granted and that Plaintiff is entitled to default judgment as to liability for all counts of the Amended Complaint, including Count II (Breach of Contract), and to reasonable attorney's fees and costs.[5]

## I. BACKGROUND

### A. Factual and Procedural Overview

This case arises from an Asset Purchase Agreement ("Agreement") between Plaintiff Qantum Communications Corporation ("Qantum") and Defendant Star Broadcasting, Inc. ("Star") and Ronald E. Hale, Sr. ("Hale") (collectively "Defendants") that was executed on September 5, 2003 for the purchase of WTKE–FM ("WTKE"), a radio station licensed in Holt, Florida that transmits through the Ft. Walton Beach, Florida market. Plaintiff describes the WTKE radio station assets, the focus of this litigation, as the more important part of a two-station deal in which Hale and companies owned by his family entered into two separate agreements on September 5, 2003 to sell Qantum the assets of two radio stations, WTKE and WMMK–FM ("WMMK").[6] Plaintiff's Amended Complaint explains the business strategy of this two-station deal:

> It was strategically important to Qantum to acquire both stations due to economies of scale in operations and advertising sales advantages in owning multiple stations in a single market. And by adding WMMK and WTKE to the two stations Qantum already owned in the market, Qantum would for the first time be in a position to compete on near-equal footing with the station group owned by Cumulus [Broadcasting, Inc.], the dominant player in the market with a 70 percent share of total advertising revenue.

(Amended Complaint, D.E. No. 87 at ¶ 15). Plaintiff explains that the deal was implemented through two agreements because the two stations were owned by different corporations. *Id.* at ¶ 16. However, Hale himself negotiated the deals for both stations. *Id.* Plaintiff alleges that "the signing of these two agreements began what has become a nearly two-year ordeal during which the Hale parties have done vir-

---

5. This finding is an alternative basis for this Court's judgment as to liability for Count I, Count III, and Count IV of the Amended Complaint.

6. The other radio station deal was between Qantum and Gulf Breeze Media, Inc. ("Gulf Breeze"). Ronald E. Hale, Sr. is the General Manager of Star Broadcasting, he also handles the day-to-day operations and all busi-

ness transactions related to Star Broadcasting. Hale's wife and children, including Ronald E. Hale, Jr., own Star. The Hales also own Gulf Breeze, but as in the case of Star, Ronald E. Hale, Sr. is the General Manager of Gulf Breeze. *See* (D.E. No. 118, Exh. 16 at 1–2) (Bankruptcy Court Order). This Court notes that Defendants have not disputed these facts.

tually everything in their power to frustrate and prevent the consummation of the contracts they signed." *Id.* at ¶ 17.

Plaintiff's Amended Complaint requests declaratory relief, injunctive relief, and specific performance. Plaintiff alleges that the WTKE assets are unique, that specific performance was the relief specified in the contract, and that the WTKE assets are a strategically essential part of Plaintiff's business plan to enter the Ft. Walton Beach market. *Id.* at 2–3. In essence, Plaintiff alleges that Defendants breached the "Non–Solicitation" provision of the Agreement by negotiating with Plaintiff's main competitor, Cumulus Broadcasting, Inc. ("Cumulus"), and then contracting to sell the WTKE assets to Cumulus.[7] On April 14, 2005, Defendants gave termination notice to Plaintiff, pursuant to a provision of the contract that allows either party to terminate at will provided that the closing has not been consummated on or before eighteen months after the date of the Agreement, and provided that "the party seeking to terminate this Agreement is not then in breach of this Agreement." (D.E. No. 126, Exh. B (exhibit attached to Affidavit of Ronald Hale, Sr. dated May 17, 2006)). However, Plaintiff argues that this termination notice was invalid because Defendants were already in breach of the Agreement's "Non–Solicitation" provision, a covenant that requires that the parties not take any action "inconsistent" with the agreement, and various other alleged breaches.

In contrast, Defendants argue that it had become apparent that the deal could not be consummated before the expiration of the Agreement because of Federal Communication Commission (FCC) licensing is-

sues, and that Plaintiff "manufactured" breaches in order to prevent Defendants from terminating the Agreement. When the Plaintiff sent Defendants a "breach letter" dated January 12, 2005, the Defendants issued a response letter dated February 11, 2005, which Defendants claim explained why breaches had not in fact occurred or how immaterial breaches had been cured. (D.E. No. 26 at 7). As is discussed further *infra*, the main thrust of Defendants' legal arguments is that the alleged breach of the non-solicitation provision is an immaterial breach because it was the non-occurrence of a condition precedent of the Agreement (i.e. FCC approval), rather than Defendants' acts or omissions, that prevented the deal from closing.

This Court has diversity jurisdiction over the parties under 28 U.S.C. § 1332. Plaintiff is a corporation organized under the laws of Delaware with its principal place of business in Connecticut. Defendant Star Broadcasting is a corporation organized under the laws of Florida, with its principal place of business in Ft. Walton Beach, Florida. Defendant Ronald Hale is a resident of the state of Florida. In an Order dated August 4, 2005, this Court denied Defendants' motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), motion to transfer for improper venue under 28 U.S.C. § 1406(a), and motion to transfer for convenience of the parties pursuant to 28 U.S.C. § 1404(a). (D.E. No. 41).

On July 5, 2005 this Court issued an Order granting Plaintiff's Motion for a Temporary Restraining Order (D.E. No. 10) after an *ex parte* hearing on the same date. The Court later extended the Tem-

---

**7.** It is undisputed that Star and Cumulus had previously negotiated for Cumulus to purchase WTKE before the execution of the Agreement with Qantum. *See* (D.E. No. 118, Exh. 3 (Plaintiff's Exhibit 57)). However, efforts to complete a contract for sale were unsuccessful.

porary Restraining Order, with the consent of the parties, until August 3, 2005 in an Order Granting Agreed Motion for Continuance of Preliminary Injunction Hearing (D.E. No. 17), issued on July 8, 2005. That Order stated that the Temporary Restraining Order was extended until August 3, 2005, or until further order of the Court, whichever period is shorter.

Shortly before the preliminary injunction hearing was held, Plaintiff filed an extensive Reply Memorandum in support of its Motion for a Preliminary Injunction.[8] *See generally* (D.E. No. 36). Plaintiff's Reply Memorandum explained that discovery propounded to third parties revealed a number of what Plaintiff describes as "smoking-gun" documents that Defendants had failed to produce in response to Plaintiff's comprehensive document requests. *See* (D.E. No. 36 at 3; D.E. No. 117 at 1). As is further discussed in the context of the Motion for Sanctions, Plaintiff argues that these documents are evidence that Hale perjured himself at his video deposition and that Star engaged in a scheme to defraud the Court and to avoid the enforcement of the Agreement at any cost. Following a preliminary injunction hearing held on the record on August 3, 2005, this Court extended the Temporary Restraining Order until August 12, 2005 in order to more fully consider the arguments made by both parties at the hearing. (D.E. No.

37). On August 16, 2005 this Court issued a Corrected Order Granting in Part Plaintiff's Motion for a Preliminary Injunction, and it issued a preliminary injunction.[9] (D.E. No. 46).

On September 27, 2005 this Court set this case to go to trial during the calendar period commencing on February 6, 2006. (D.E. No. 70). Shortly thereafter, on October 17, 2005, Defendants' attorneys sought leave to withdraw as counsel.[10] (D.E. No. 78). This Court granted that motion on October 31, 2005 and required that Defendant Star Broadcasting secure counsel by November 11, 2005. (D.E. No. 81). The Court further ordered that Defendant Hale had until November 11, 2005 to secure counsel or file a notice of intent to proceed *pro se*. *Id.* On November 7, 2005 this Court granted Plaintiff's Motion for Leave to file an Amended Complaint, which is the operative complaint. (D.E. Nos. 86 and 87). Defendant Hale filed a notice of intent to proceed *pro se* on November 10, 2005. (D.E. No. 89). However, Defendant Star filed for Chapter 11 relief in the Bankruptcy Court for the Northern District of Florida on November 10, 2005. *See* (D.E. No. 94). This action resulted in an automatic stay which stalled the instant litigation and the appeal filed by Defendants in the United States Court of Appeals for the Eleventh Circuit.[11]

---

8. The Court granted Plaintiff's associated Motion for Leave to Exceed Page Limitations. (D.E. No. 42).

9. That order corrected clerical errors contained in this Court's Order Granting in Part and Denying in Part Plaintiff's Motion for a Preliminary Injunction. *Compare* (D.E. No. 46) *with* (D.E. No. 43).

10. The Bankruptcy Court Order, which is discussed *infra*, later noted: [Star] has six unsecured creditors with claims of $356,968.18 of which Zuckerman–Spaeder [, Defendants' former counsel,] is listed as being owed the

disputed amount of approximately $236,000. (D.E. No. 118, Exh. 16 at 5).

11. See Defendants' Amended Notice of Appeal (D.E. No. 53), which sought an interlocutory appeal of this Court's Corrected Order Granting in Part and Denying in Part Plaintiff's Motion for a Preliminary Injunction Order Denying Defendants' Motion to Dismiss for Improper Venue or to Transfer Pursuant to 28 U.S.C. § 1406 or 1404. That appeal was initially stayed by the Eleventh Circuit (D.E. No. 100), and eventually dismissed for failure to prosecute the appeal (D.E. No. 123).

On December 7, 2005 Qantum moved to dismiss the bankruptcy action. *See id.* On January 20, 2006 Plaintiff filed a notice of the "Order on Qantum Communication's Motion for Relief From Automatic Stay and Motion to Dismiss" issued by the Bankruptcy Court for the Northern District of Florida. (D.E. No. 101). That Notice included a copy of the Bankruptcy Court's Order that lifted the automatic stay and allowed Qantum to continue the pursuit of its claims in this Court. *Id.*, Exh. 1 at 14. On February 16, 2006 Defendants secured counsel, who filed a Notice of Appearance. (D.E. No. 112). On April 5, 2006 Plaintiff filed the instant Motion for Sanctions and Motion for Summary Judgment, and after extensive briefing and a multitude of related filings, oral argument on the two motions was heard on October 17, 2006.

## B. Relevant Language of the Agreement

This Court now describes the provisions of the Agreement that are relevant to the instant Motion for Summary Judgment and Motion for Sanctions. An important feature of the Agreement, and one which both sides do not dispute is typical in the radio communications industry, is the fact that Defendants did not own the assets to WTKE at the time of the execution of the Agreement. Rather, Defendants had to acquire WTKE from Clear Channel Communications, Inc. ("Clear Channel") through a "station swap" in which Star would provide Clear Channel with WQYZ–FM ("WQYZ") in exchange for WTKE. Approval from the FCC was necessary for each of these transactions. Plaintiff notes that the FCC granted approval of Clear Channels acquisition of the station it was to receive from Star on May 26, 2005. (D.E. No. 87 at ¶ 25).

Plaintiff has maintained, both in its Motion for Preliminary Injunction and its Amended Complaint, that "WTKE is a unique property due to its relative position in the local and national markets, its location, its licensing and frequency, its assets, and its strategic importance in Qantum's overall business plan." (D.E. No. 87 at ¶ 20). Furthermore, Article 17.4 of the WTKE Purchase Agreement states:

> [Star Broadcasting] and [Hale] each agrees that [WTKE] is unique and cannot be readily obtained on the open market and that [Qantum] will be irreparably injured if this Agreement is not specifically enforced. Therefore, in the event that [Qantum] institutes any action specifically to enforce [Star Broadcasting] and [Hale's] performance under this Agreement, [Star Broadcasting] and [Hale] each agrees to waive the defense that [Qantum] has an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of specific performance as a remedy.

(D.E. No. 118, Exh. 2 at 32–33).

A critical feature of Agreement, and the provision that is at the center of this litigation, is what Plaintiff describes as the "No–Shop" provision ("No–Shop Provision"). Article 8.9 of the agreement states as follows:

> 8.9 *Non–Solicitation.* As long as this Agreement is in effect and except as otherwise provided in this Agreement, neither [Hale], [Star Broadcasting] nor any of its principals shall directly or indirectly solicit, entertain, negotiate with any person or entity (other than a party hereto) or accept any proposal to acquire [Star Broadcasting], [WTKE] or any of [WTKE] Assets in whole or in part, including without limitation an acquisition of all or substantially all of the assets of [Star Broadcasting], any equity in [Star Broadcasting] or any rights to program [WTKE].

(D.E. No. 118, Exh. 2 at 21).

Notably, the Agreement contained a time-sensitive termination provision. Arti-

cle 17.1(g) provides that the WTKE Purchase Agreement may be terminated:

> by written notice of either party to the other if the Closing shall not have been consummated on or before the date eighteen (18) months after the date of this Agreement [i.e., on or before March 5, 2005], *and the party seeking to terminate this Agreement is not then in breach of this Agreement.*

(D.E. No. 118, Exh. 2 at 32) (emphasis added).

Lastly, for the purpose of the discussion of the instant motions, Article 8.1(e) of the agreement states: *"No Inconsistent Action.* Neither [Star] nor [Hale] shall take any action which is inconsistent with its obligations under this Agreement." ("No Inconsistent Action Provision") *Id.* at 20.

### C. Defendants' Pattern of Misconduct

Plaintiff alleges that Defendants have engaged in a continuous pattern of misconduct in an effort to avoid their obligations under the Agreement at any cost. This Court discusses the evidence related to these allegations in detail in its discussion of the Motion for Sanctions, *infra.* In essence, Plaintiff alleges that Defendants failed to produce "smoking-gun documents" that clearly demonstrate Defendants' breaches of the No–Shop Provision and the No Inconsistent Action Provision. Furthermore, Plaintiff alleges that these documents also show that Defendant Hale perjured himself during his sworn video deposition and that Defendants tried to convince Cumulus to help conceal the evidence of their breaches. Plaintiff also alleges that Defendants' bankruptcy filing was a bad-faith maneuver to avoid this litigation and the related appeal before the Eleventh Circuit, to avoid the Court's preliminary injunction, and to circumvent the agreement with Qantum in order to close a deal with Cumulus. Plaintiff alleges that

Defendants misconduct reflects an attempt to defraud the Court that has continued into the present in the form of conclusory affidavits and frivolous arguments that have forced Plaintiff to expend even more resources in enforcing the Agreement. The evidence related to these allegations are discussed in Section III(B) of this Order, *infra.*

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard of Analysis

The standard of analysis for a summary judgment motion is stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury,* 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party "may not rest upon the mere allegations or deni-

als of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248, 106 S.Ct. 2505.

In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden applicable to the particular cause of action before it." *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. Summary judgment may be granted if the nonmovant fails to adduce evidence which, when viewed in a light most favorable to him, would support a jury finding in his favor. *Id.* at 254–55, 106 S.Ct. 2505.

Furthermore, the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Id.* If the non-movant's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348.

Lastly, this Court emphasizes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

**B. Discussion**

Plaintiff argues that it is undisputed that Defendants materially breached the Agreement, and that this "render[ed] invalid the purported termination of the Agreement" and entitles Qantum to: 1) a declaration that the Agreement is still in effect, 2) an order of specific performance with respect to Defendants' obligations under the Agreement to proceed to closing, and 3) a permanent injunction requiring Defendants to abide by the terms of the Agreement pending closing of the WTKE deal. In response, Defendants essentially raise a number of legal arguments about how the language of the contract should be construed, and the materiality of the purported agreements. For the reasons discussed in this Order, this Court agrees that there are no genuine issues of material fact and that Plaintiff is entitled to summary judgment as to liability on its claims for declaratory relief, specific performance, and injunctive relief. In sum, this Court finds that there was an agreement between Plaintiff and Defendants, which Defendants materially breached, and that under the terms of the Agreement Plaintiff is entitled to specific per-

formance, injunctive relief, and declaratory judgment.

### 1. There was an agreement between Plaintiff and Defendants

Initially, this Court notes that it is undisputed that the Plaintiff and the Defendants entered into the Agreement to sell the assets of WTKE to Qantum for $3 Million. (D.E. No. 118, Exh. 2). There is no dispute that the copies of the Agreement, which is entitled "Asset Purchase Agreement Dated As of September 5, 2003 By and Among Star Broadcasting, Inc., Ronald E. Hale, Sr. and Qantum Communications Corporation," that have been filed in support of various motions are complete and accurate copies of the Agreement. *See e.g.* (D.E. No. 87, Exh. A; D.E. No. 117, Exh. 1; D.E. No. 118, Exh. 2).[12] Furthermore, the Agreement clearly states, and no party disputes, that the Agreement is governed by Florida state law. (D.E. No. 118, Exh. 2 at 34 ("Article 18.7. Governing Law and Venue.")).

### 2. Defendants breached the No–Shop Provision of the Agreement

■ As was noted *supra,* the Agreement includes a No–Shop Provision that precludes Star or Hale from soliciting, entertaining, or negotiating with entities other than Qantum regarding the WTKE Assets while the Agreement is in effect.

Since before this lawsuit was filed, an important issue has been when Defendants were in contact with Cumulus about the possibility of a WTKE deal and when Defendants and Cumulus reached an agreement for Cumulus to acquire the WTKE assets.[13] At the inception of this lawsuit, Defendants maintained the position that there was no contact between Defendants and Cumulus regarding the acquisition until after March 5, 2005. Defendants argued that this was the date that the agreement became automatically terminated. In sharp contrast, Plaintiff has provided a substantial amount of documentary and deposition testimony evidence that indicates that Defendants approached Cumulus about the possibility of Cumulus acquiring WTKE as early as October 24, 2004. Rather than contest the authenticity of this body of evidence, which consists largely of email correspondence between Defendants and Cumulus, as well as sworn deposition testimony, Defendants have attempted to argue that the evidence is legally irrelevant because the purported breach is immaterial.[14] However, Defendants have also submitted an affidavit of Hale that attempts to put the body of evidence in "context." As is discussed *infra,* the "facts" advanced in Hale's affidavits are essentially legal ar-

---

12. The Amended Complaint (D.E. No. 87), which adopted the Exhibits attached to Plaintiff's Proposed Amended Complaint (D.E. No. 84), includes a version of the Agreement that includes a number of associated exhibits and schedules, for example, a related escrow agreement and customer schedules. However, the versions of the Agreement filed in motions that did not include these associated materials are complete copies of the Agreement in that they include all the substantive terms of the Agreement.

13. For example, a June 9, 2005 letter from Plaintiff's present counsel to Hale requested that Hale provide the date of his first contact with any other party concerning the purchase

of WTKE and that Star and Hale "confirm in writing that they will take all steps necessary to preserve all information and documents." (D.E. No. 132, Exh. B).

14. This Court notes that at the preliminary injunction hearing, former counsel for Defendants stated: "For purposes of this argument, I am conceding that we are in violation of the no solicitation clause .... I do not want to dispute those facts." (Injunction Hearing Transcript D.E. No. 118, Exh. 5 at 13:11–14). Former defense counsel then advanced a materiality argument that is substantially similar to that advanced by the Defendants' current counsel.

guments regarding the materiality of Defendants' actions and the legal effect of the alleged breaches.

Plaintiff's Composite Exhibit 3 in support of its Motion for Summary Judgment demonstrates a pattern of correspondence between Defendant Hale and Lew Dickey ("Dickey"), CEO of Cumulus.[15] An email from Hale to Dickey dated October 13, 2004 and entitled "Ft. Walton Beach Swap" proposes a station trade whereby Cumulus would "receive WTKE–FM when the contract expires with Qantum." (D.E. No. 118, Exh. 3) (Plaintiff's Exhibit 56). The email notes that his proposed deal could increase Cumulus' "cluster in Ft[.] Walton Beach" and "prevent Qantum from becoming competitive." *Id.* A follow up email sent by Hale to Dickey the next day reiterates a proposed deal involving WTKE, noting that "we could then do our original swap of WTKE–FM which is owned by Star Broadcasting whose contract for sale runs out on March 7, 2005." *Id.* (Plaintiff's Exhibit 57).

Later, on October 18, 2004, Hale sent Dickey an email that explained in relevant part: "WTKE–FM has a contract with Qantum that runs out March 7th 2005 which we think they have already breached .... The best path for the two of us is to allow the time to run out and simply file a new contract at that time." *Id.* (Plaintiff's Exhibit 58). In response to that email, approximately seven minutes later, Dickey wrote: "First, it sounds like we are apart on price. Assuming that we can agree on value, I would be interested in proceeding with TKE once the [Qantum] APA expires." *Id.* (Plaintiff's Exhibit 59). Hale then responded, fourteen minutes later: "Lew ... I am confident we can find

some agreement on [p]rice." A few days later, on October 26, 2004, Hale wrote: "I have had meetings with all the shareholders and [have] gotten them to agree to meet you half way on the price .... Can you move up to 3.75M and [s]wap WTKE–FM (1.75 Mil) and WPGG–FM (2 Mil) for your 6KW and 25KW?" *Id.* (Plaintiff's Exhibit 61). He also noted: "I think you might want to consider keeping WTKE's Sports format." *Id.* Notably, in one email dated November 30, 2004, entitled "Asset Purchase Agreements (WPGG, WTKE)," Hale wrote: "I had John Finch [my CFO email] you the Asset Purchase Agreements .... Let me know if they got there." [16] *Id.* (Plaintiff's Exhibit 66). On November 30, 2004 Dickey wrote: "I received the APA's and have just forwarded them to our General Counsel to review." *Id.* Sworn testimony from Lew Dickey's deposition further confirms that between October 2004 and March 3, 2005 Defendants and Cumulus exchanged proposals as to how much cash Defendants would receive in a swap that involved WTKE and WPPG. (D.E. No. 118, Exh. 4, Depo. Dickey at 118:6–17). Furthermore, on February 15, 2005, Hale emailed Richard Denning ("Denning"), general counsel for Cumulus, an attachment entitled "Overview Ft. Walton Beach" that summarized a deal involving WTKE: "The total price is 3 Million for WPGG–FM and WTKE–FM and the swap of WNCV–FM and WYZB–FM in Ft. Walton Beach ... Cumulus ends up with WTKE–FM ... and WPGG–FM ... Star ends up with WYZB–FM and ... WNCV–FM ...." (D.E. No. 118, Exh. 14 at 2).

**15.** For the purpose of clarity, this Court refers to individual exhibits within Plaintiff's composite exhibits by the "Plaintiff's Exhibit" number, which was assigned by Plaintiff at depositions.

**16.** The Agreement contains a rather extensive confidentiality provision in Article 10.1(a). This Court notes, but it does not hold, that it appears likely that Defendants were also in breach of the confidentiality provision.

In response to Plaintiff's Motion for Summary Judgment, Defendants' Opposition Memorandum relies heavily on an affidavit of Hale and an affidavit of John Finch, an employee of Star Broadcasting. Hale's affidavit emphasizes that he "repeatedly told Cumulus in phone conversations and by email that WTKE was under contract for sale to Qantum and that a sale to Cumulus could not be contracted for until the Qantum contract had expired." (Aff. Hale at ¶ 6). Hale further explains:

> The communications with Cumulus starting in October 2004 were not what I would describe as negotiations. Instead, I viewed them as preliminary, exploratory comments, sort of allowing the parties to "kick the tires" on our car. Negotiations did not commence until after the March 5, [2005] deadline had expired and it took until April 18, 2005 for those negotiations to conclude and a contract to be executed with Cumulus. I believed that these types of exploratory communications were appropriate at that point due to the potential inability to timely close on the WTKE Purchase Agreement given the delay in getting the required FCC approval. In fact, consistent with "the handwriting on the wall", FCC approval was not obtained as of March 5, 2005 or even as of April 14, 2005 (the date of the termination letter-a copy of which is attached as Exhibit "A").

(D.E. No 126, Exh. B at ¶ 7.) Defendants' Opposition Memorandum argues that Defendants' "communications with Cumulus regarding WTKE did not, and were not intended to, violate the purpose for which these no shop provisions are included in purchase agreements such as the WTKE Purchase Agreement." (D.E. No. 126 at 4). Furthermore, Defendants argue "it was never the intention of Star to utilize, nor did it ever utilize, the WTKE Purchase Agreement as a 'stalking horse' for the Defendants to go out and shop the contract around and find out who could beat the contract." *Id.* This Court observes that Defendants offer no evidence to dispute the evidence proffered by Plaintiff regarding the exchange of emails and phone conversations between Hale and Dickey, rather they attempt to re-characterize the undisputed facts and to argue about the legal effect of those exchanges. This Court further addresses these arguments in the context of the materiality of Defendants' breaches.

While Defendants' Opposition Memorandum provides a recitation of purported material facts to which there exists a genuine issue of material fact, this Court agrees with Plaintiff that the list consists of legal conclusions and legal arguments. *See* (D.E. No. 126 at 9–12). Furthermore, Defendants argue that "[i]t is incumbent upon Qantum, as the party moving for summary judgment, to address the affirmative defense raised by the Defendants." *Id.* at 6. This Court disagrees. As the case cited by Defendants states: "a defendant relying solely upon an affirmative defense to thwart a plaintiff's summary judgment motion must establish both the applicability of the defense(s) and triable issues of fact as to the existence of each essential element of that defense." *Conoco, Inc. v. J.M. Huber, Corp.,* 148 F.Supp.2d 1157, 1168 (D.Kan.2001) (citing *Blue Cross & Blue Shield v. Weitz,* 913 F.2d 1544, 1552 (11th Cir.1990)) (explaining that "[w]hen a motion for summary judgment is made and supported as provided in [Federal Rule of Civil Procedure 56(e) ], an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

This Court agrees with Plaintiff that the five affirmative Defenses raised by Defen-

dants' Opposition Memorandum are legal arguments, as opposed to disputed issues of material fact. Furthermore, Defendants' twelfth, fourteenth, fifteenth, and sixteenth affirmative defenses are all legal arguments related to Defendants' materiality arguments. Thus, this Court finds that Defendants have failed to demonstrate the existence of any genuine issues of material fact, and that summary judgment is appropriate.[17]

After carefully reviewing all the evidence in the record in this case, this Court finds that as a matter of law Defendants breached the plain language of Article 8.9 of the Agreement. The language of that provision is crystal-clear:

> As long as this Agreement is in effect and except as otherwise provided in this Agreement, neither [Hale], [Star Broadcasting] nor any of its principals shall directly or indirectly solicit, entertain, negotiate with any person or entity (other than a party hereto) or accept any proposal to acquire [Star Broadcasting], [WTKE] or any of [WTKE] Assets in whole or in part, including without limitation an acquisition of all or substantially all of the assets of [Star Broadcast-

ing], any equity in [Star Broadcasting] or any rights to program [WTKE].

(D.E. No. 118, Exh. 2 at 21). This Court finds that as a matter of law Defendants solicited, entertained, and negotiated proposals to acquire the WTKE assets with Cumulus, and they were therefore in breach of Article 8.9 of the agreement.

### 3. Defendants Breached the No Inconsistent Action provision and their duty of good faith and fair dealing.

Plaintiff also argues that Defendants breached the No Inconsistent Action Provision as well as the duty of good faith and fair dealing that attaches to that provision as well as other requirements under the Agreement. This Court agrees. As was discussed *supra*, there is no genuine issue of material fact that Defendants negotiated with Cumulus, and that Cumulus was Plaintiff's main competitor in the relevant market. *See* (D.E. No. 118, Exh. 3 (Plaintiff's Exhibit 56)). Notably, in one of the initial emails during the fall of 2004, Hale wrote that a Ft. Walton Beach radio stop would help Cumulus "increase [its] cluster in Ft. Walton Beach ... and prevent Qantum from becoming competitive."

---

**17.** Defendants' Surreply in opposition to Summary Judgment includes an affidavit of an individual whose name is alternatively spelled "Michael Leibowitz" or "Michael Leibowitz." (D.E. No. 147, Exh. A). It appears that Defendants are attempting to offer this individual, who is an attorney, as an expert in "FCC and broadcast related representation." *See* (Aff. Leibowitz at ¶¶ 3–4). The affidavit is mainly directed towards describing the legal significance of the No–Shop Provision, which this Court finds is ultimately a legal conclusion.

Accordingly, to the extent that Defendants are offering this affidavit as expert testimony this Court finds that the affidavit should be excluded because it: 1) fails to demonstrate that the "methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*," and 2) fails to assist "the trier

of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (noting that appellate courts review the district court's rulings excluding the plaintiffs' expert testimony for abuse of discretion).

Alternatively, to the extent that Defendants are relying on this Affidavit as non-expert testimony, this Court finds it is irrelevant. This Court does not consider the affidavit as evidence that demonstrates a genuine issue of material fact. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991) (stating that "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial.").

*Id.* A few days later Hale wrote: "WTKE–FM has a contract with Qantum that runs out March 7th 2005 which we think they have already breached . . . . The best path for the two of us is to allow the time to run out and simply file a new contract at that time." *Id.* (Plaintiff's Exhibit 59).

Perhaps most notably, in an email dated December 16, 2004 Hale expressed concern about a requirement of the Agreement that requires Defendants to enter into a Local Marketing Agreement (LMA) with Qantum. Article 4.2 of the Agreement essentially acknowledges that once Qantum closes on the purchase of the assets of WMMK, Hale shall permit Qantum to broadcast over WTKE. Hale wrote to Richard Denning, Cumulus' counsel:

> Richard . . . we've been looking at several sections of the Qantum/Star contract that bother us . . . . Section 4.1, 4.2 and 17.1[.]Termination says that we would need to give [Qantum] an LMA or be in breach if they buy WWRK (WMMK) so what can we do to not LMA it or have you come up with a way for Lew to slide into our position . . . . so how can we get around that . . . . I wonder if we need to blow up the WWRK deal by putting it into Chapter 7.

(D.E. No. 118, Exh. 3, Plaintiff's Exhibit 71). In a later email to Lew Dickey and Richard Denning, Hale wrote: "The timing of WPGG–FM I think is critical . . . . Once Qantum figures out that we don't want to close WTKE–FM which could be early next week, I think they will immediately react . . . knowing we hav[e]n't closed yet, we're a sitting duck." *Id.* at Exh. 8.

Later, on March 29, 2005, Timothy Brady, Defendants' FCC counsel, wrote an email to Brooks Milling regarding various security and loan documents that stated:

> The deal with Qantum is this. Star has the right to terminate that agreement now, provided we are not in breach. All

I am trying to do with these documents is assure that they can be executed by Star without resulting in a breach of its agreement with Qantum . . . . Star currently has an agreement to sell WTKE to Qantum, so an assignment of proceeds is a right relating to an existing agreement. Star intends to terminate that agreement only if it has a backup agreement in place with Cumulus to purchase WTKE.

(D.E. No. 118, Exh. 9).

As this Court has already noted, an important feature of the Agreement was that Defendants had to obtain the WTKE assets through a station swap with Clear Channel. Defendants repeatedly argue in their filings that it was the failure of the FCC to approve Clear Channel's receipt of WQYZ that prevented the closing from taking place. However, Plaintiff's have submitted evidence that Clear Channel proposed decoupling the transaction so that Star would receive the WTKE assets separate from WQYZ. On February 22, 2005 Rick Wolf, Vice President/Corporate Counsel of Clear Channel emailed Timothy Brady and stated: "Tim, please give me a call regarding separating WTKE from WQYZ and closing WTKE." (D.E. No. 118, Exh. 12). Hale later explained in an email attempting to schedule a conference with Denning and Dickey: "Qantum is in a full court press to get all the paper work ready for closing . . . . Clear Channel thinks we will be in a position to close the end of the first week or the second week of March." (*Id.* at Exh. 11). Similarly, in an email to Richard Denning, Hale wrote: "I just received an email from Rick Wolf at Clear Channel wanting to talk to Tim Brady about moving forward and uncoupling the Exchange agreement to move forward on closing WTKE–FM . . . . so our phone meeting on Thursday will be super important . . . [W]e can't close WTKE–FM with[out] an agreement with you or we

would be forced to close with Qantum." *Id.* at Exh. 13.

Furthermore, evidence indicates that Defendants kept information about the possibility of closing on WTKE with Clear Channel from Qantum in order to: 1) postpone the closing until after March 5, 2005 and avoid selling to Qantum; 2) buy time to complete a deal with Cumulus, and 3) "give [Qantum] less of a legal position" in any subsequent lawsuit. *See id.* at Exh. 14; Exh. 13. Timothy Brady, Defendants' FCC counsel testified that Defendants knew of the possibility of closing the WTKE deal prior to March 5, 2005 but failed to tell Qantum out of concern that Star would be forced to close with Qantum rather than Cumulus. *See* (D.E. No. 139 (Depo. Brady at 165–68)). As Plaintiff notes, the Bankruptcy Court found that the emails were evidence of an overall "scheme" by Defendants to avoid the WTKE Agreement. (Bankruptcy Court Order at 11–12; D.E. No. 118, Exh. 16); *see also* discussion in Section III(B)(3), *infra.* This Court agrees with that characterization. This Court recognizes that Hale's Affidavit dated May 17, 2006, which was filed as an exhibit to Defendants' Opposition to Plaintiff's Motion for Summary Judgment, explains that there are independent reasons why the decoupling proposal was "not workable." *See* (D.E. No. 125, Exh. B at ¶ 11). However, this point does not squarely address the undisputed evidence that indicates that Defendants did not communicate the possibility of decoupling the Clear Channel exchange to Plaintiff. Instead, Hale contacted Cumulus about the urgency of reaching an agreement with Cumulus, noting "we can't close WTKE [without] an agreement with you or we would be forced to close with Qantum." (D.E. No. 118, Exh. 13).

After carefully reviewing all the evidence in the record in this case, this Court finds that there is no genuine issue of material fact, and that as a matter of law Defendants breached the plain language of Article 8.1(e) of the Agreement that mandates that "[n]either [Star] nor [Hale] shall take any action which is inconsistent with its obligations under this Agreement." *See also* (D.E. No. 118, Exh 2. Agreement Articles 10.1(a) (governing confidentiality)); 10.1(b) (stating that the parties "shall cooperate fully with one another in taking any actions, including actions to obtain the required consent of any governmental instrumentality or any third party necessary or helpful to accomplish the transactions contemplated by this Agreement.") Similarly, this Court finds that Defendants breached the implied duty of good faith and fair dealing that attaches to the No–Shop Provision, the No Inconsistent Action Provision, and the "Cooperation" provision in Article 10.1(b). *See Cibran Enterprises, Inc. v. BP Products North America, Inc.,* 365 F.Supp.2d 1241, 1245 (S.D.Fla.2005) (explaining that the implied covenant of good faith and fair dealing is a part of every contract under Florida law, and that the implied covenant attaches to the performance of a specific contractual obligation).

**4. The Breaches of the No–Shop Provision, the No Inconsistent Action Provision, and the implied duty of good faith and fair dealing were material**

■ This Court now considers Defendants' arguments that the breaches of the No–Shop and No Inconsistent Action provisions were immaterial breaches.[18] This legal argument is largely driven by Defendants' legal position that their termination

---

**18.** As this Court explains *infra,* the plain language of the relevant termination provision does not require that any breach be material. Nevertheless, in abundance of caution, this Court addresses the Defendants' materiality arguments.

notice dated April 14, 2005 was valid. Defendants argue that the issue of whether the No–Shop Provision was violated is legally irrelevant, and that the "pivotal issue" in this case is whether any of the breaches "were material and could, as a matter of law, prevent Star from terminating the WTKE Agreement after the expiration of the March 5, 2005 deadline." (D.E. No. 126 at 5). Defendants advance a legal argument that is very similar to the one advanced by Defendants' former counsel at the preliminary injunction hearing. Defendants argue that any breach of the No–Shop Provision was not material because:

(i) a condition precedent to the closing (FCC approval) had not occurred as of March 5, 2005, or for that matter, as of April 14, 2005, the date of the termination letter, (ii) it was the lack of approval from the FCC that prevented the consummation of the closing before the WTKE Agreement was terminated, and (iii) any breach of the No–Shop Provision had absolutely no bearing on the inability to timely obtain the required FCC approval prior to the termination of the WTKE Agreement.

(D.E. No. 126 at 5).

This Court disagrees with Defendants' argument, which was explored in depth at oral argument on October 17, 2006. When viewed in the context of the entire agreement, Defendants' actions of soliciting and negotiating to sell WTKE to Plaintiff's main competitor in the relevant market in direct contravention of a No–Shop Provision is the most material breach imaginable. The manner in which Defendants solicited and negotiated to sell WTKE to Cumulus, which this Court has already found breached the No Inconsistent Action

Provision and the implied duty of good faith and fair dealing, contravenes the general purpose of the agreement as a whole, which was to secure Qantum's exclusive ability to purchase WTKE dependent on certain conditions, most notably Star's ability to acquire the WTKE assets.

While Defendants argue that the "handwriting was on the wall" that the necessary FCC approval of the proposed swap between Star and Clear Channel could not be obtained, the undisputed evidence demonstrates that not only did Defendants fail to take steps to try to complete the deal with Qantum, but they actively took steps to prevent it. Nearly six months before the date that Defendants claim that the deal expired, Defendants actively solicited and negotiated with Cumulus involving WTKE assets that were under contract in an attempt to resurrect the previous deal between Cumulus and Star that had not been completed.[19] Defendants failed to disclose the possibility of decoupling the WTKE and WQYZ exchange with Clear Channel to Plaintiff, see (D.E. No. 118, Exhs.11–13), Defendants worked to develop a strategy to avoid entering into an LMA with Qantum, see id. at Exh. 7, and they actively pursued strategies to avoid being "forced to close with Qantum." See id. at Exh. 13. In this context, Defendants' attempt to shift focus to the condition of FCC approvals and argue that their actions did not constitute material breaches is unpersuasive.

Furthermore, this Court is not persuaded by the case law that Defendants cite in support of their argument that "[t]he breaches relied upon by Qantum to support its Motion [for Summary Judgment] were not material since the condition prec-

---

**19.** In an email to Lew Dickey, Hale explains: "[W]e can have the Qantum contract rejected .... We could then do our original swap of WTKE–FM which is owned by Star Broad-casting whose contract for sale runs out on March 7th 2005." (D.E. No. 118, Exh. 3 (Plaintiff's Exhibit 57)).

edent to closing (FCC approval) had not occurred prior to termination and the alleged breaches had nothing to do with the inability to timely obtain FCC approval and did not cause any harm or loss to Qantum." (D.E. No. 126 at 7). Notably, Defendants argue that "[c]ontracts are to be interpreted to provide a reasonable, practical and lawful meaning to their terms." *Id.* (citing *Whitley v. Royal Trails Property Owners' Association, Inc.,* 910 So.2d 381 (Fla. 5th DCA 2005)). This Court finds that this observation militates more in favor of Plaintiff's legal position. This Court finds that the cases cited by Defendants are distinguishable because they involved parties to a contracts that attempted to terminate an agreement based on the other party's alleged breach, unlike the situation in this case where the Defendants that breached are the parties attempting to terminate. *See, e.g., Burger King Corp. v. Mason,* 710 F.2d 1480, 1490 (11th Cir.1983) (finding some of franchisee's breaches immaterial); *Westcap Gov't Secs., Inc. v. Homestead Air Force Base Fed. Credit Union,* 697 F.2d 911, 913 (11th Cir.1983) (holding that, in the absence of a termination provision, an eight day late delivery of mortgage-backed securities was not so material that it entitled the buyer to terminate the contract). This Court agrees that facts of the cases cited by the Defendants are distinguishable, and that the materiality analysis in each of the cases does not apply in the instant case.

**5. Defendants' attempt to terminate the Agreement on April 14, 2005 was invalid under the plain language of the Agreement**

 After carefully reviewing the parties' arguments, this Court finds that Defendants' attempt to terminate the Agreement on April 14, 2005 was invalid under the plain language of the agreement. Article 17.1(g) provides that the WTKE Purchase Agreement may be terminated:

by written notice of either party to the other if the Closing shall not have been consummated on or before the date eighteen (18) months after the date of this Agreement [i.e., on or before March 5, 2005], *and the party seeking to terminate this Agreement is not then in breach of this Agreement.*

(D.E. No. 118, Exh. 2 at 32) (emphasis added). As is explained *supra,* the main thrust of Defendants' legal argument is that there was no material breach that invalidates Defendants' Notice of Termination. This Court first notes, as Plaintiff emphasized in its Motion for Summary Judgment and in its Reply Memorandum, that the plain language of the agreement contains the language "not then in breach," which contains no requirement that any breach be "material." However, Defendants argue that "the only lawful interpretation and construction of the termination provisions within the context of the entire agreement and the surrounding circumstances requires a material breach to preclude termination." (D.E. No. 126 at 7). This Court disagrees.

There is well-established precedent under Florida law and case law in the Eleventh Circuit that contracts are to be given their plain meaning. *See Dickerson Fla., Inc. v. McPeek* 651 So.2d 186, 187 (Fla. 4th DCA 1995) (noting that "[i]t is axiomatic that where the language of a contract is clear and unambiguous, a trial court is not at liberty to modify the agreement and therefore must give effect to its express provisions."); *Vernon v. Resolution Trust Corp.,* 907 F.2d 1101, 1109 (11th Cir.1990) (stating that "[u]nder Florida law, when the terms of a contract are unambiguous, the Court is bound to give the language therein its plain and ordinary meaning.") (citing *Quesada v. Director, Federal Emergency Mgmt. Agency,* 577 F.Supp. 695, 697 (S.D.Fla.1983), *aff'd,* 753 F.2d 1011 (11th Cir.1985)). This Court also

notes that other provisions of the contract contain the language "material breach." *Compare* (D.E. No. 118, Exh.2 at Article 17.1(g)) (no materiality requirement) *with id.* at Article 17.1(b) *and id.* at Article 17.1(c) (requiring breaches "in any material respect."). This Court finds that, under the plain language of Article 17.1(g) of the Agreement, Defendants were in breach at the time that they attempted to terminate, and thus their attempt to terminate was invalid because they were "then in breach of this Agreement."[20]

In an abundance of caution, this Court emphasizes that it has already held that the breaches of the No–Shop provision and the No Inconsistent Action Provision were material. Therefore, in conclusion, Defendants' attempt to terminate the agreement was invalid because they were then in breach on April 14, 2005.

### 6. Plaintiff is entitled to declaratory relief, specific performance and injunctive relief

■ Plaintiff's argues that it is entitled to summary judgment on its claim for specific performance, pursuant to Count I of the Amended Complaint, and states that "Qantum at all times has been ready, willing and able to close on the WTKE Assets, and continues to offer payment for the WTKE Assets." (D.E. No. 118 at 10; *id.* at Exh 17 (Aff. Michael F. Mangan at ¶ 2)). Article 17.4 of the WTKE Purchase Agreement states:

> [Star Broadcasting] and [Hale] each agrees that [WTKE] is unique and cannot be readily obtained on the open market and that [Qantum] will be irreparably injured if this Agreement is not specifically enforced. Therefore, in the event that [Qantum] institutes any action specifically to enforce [Star Broad-

casting] and [Hale's] performance under this Agreement, [Star Broadcasting] and [Hale] each agrees to waive the defense that [Qantum] has an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of specific performance as a remedy.

(D.E. No. 118, Exh. 2 at 32–33). This Court agrees with Plaintiff's observation that it is well-settled that parties are free to choose their own remedies in a contract and that courts can enforce such remedies. *See, e.g., Media Gen. Broad., Inc. v. Pappas Telecasting,* 152 F.Supp.2d 865, 869 (W.D.N.C.2001) (enforcing plain language of parties' contract and ordering specific performance because "parties [are] free to shape their remedies according to their particular needs[.]"); *Ocean Dunes Devel. Corp. v. Colangelo,* 463 So.2d 437, 439 (Fla. 4th DCA 1985) (holding that "[t]here is no question that parties to a contract may agree to limit their respective remedies and that those remedies need not be the same" if the contract provision is reasonable) (citing *Jay Vee Realty Corp. v. Jaymar Acres, Inc.,* 436 So.2d 1053 (Fla. 4th DCA 1983); *Wright & Seaton v. Prescott,* 420 So.2d 623 (Fla. 4th DCA 1982)).

This Court finds that because of Defendants' breaches, the Defendants' attempt to terminate was invalid, and the agreement is still in effect. Plaintiff is entitled to specific performance to enforce the agreement under the plain language of the Agreement. Furthermore, this Court further notes that due to the circumstances of the deal embodied in the agreement, Article 17.4 is reasonable and should be enforced. *See Black v. Frank,* 176 So.2d 113 (Fla. 1st DCA 1965) (explaining that "parties may stipulate by contract what the

---

**20.** This Court has not made a specific finding as to when, as a matter of law, Defendants breached these provisions. For the purposes of this Order, it is abundantly clear that De-

fendants were in breach before April 14, 2005, the date when the Defendants attempted to terminate.

consequences of a breach shall be and such stipulation, if *reasonable*, is controlling and excludes other consequences.") (emphasis added); *see also* Injunction Order at 7 (finding that "[i]n the context of Plaintiff's acquisition strategy to enter the Ft. Walton Beach market, including its plan to take advantage of 'economies of scale' and to compete with cumulus on an 'equal basis,' the evidence before the Court shows that Plaintiff will suffer irreparable injury if Defendants are permitted to convey the WTKE assets to Cumulus Broadcasting."). Accordingly, Plaintiff is entitled to summary judgment as to liability on Count I of the Amended Complaint as a matter of law. Plaintiff is entitled to specific performance of Defendants' obligations under the Agreement, and the parties shall be required to proceed to closing.

■ Plaintiff has requested an opportunity to "prove all damages incidental to Qantum's specific performance claim and Defendants' failure to timely close at trial or in such other proceeding as the Court directs." (D.E. No. 118 at 17). This Court agrees that under Florida law damages may be awarded incident to specific performance. In *Wiborg v. Eisenberg*, the Florida Fourth District Court of Appeal held that the trial court erred in refusing to grant damages incident to specific performance and explained:

> This court has previously found that " 'damages' awarded incident to a decree of specific performance are clearly different from those which would be awarded for breach of the contract." *Walker v. Benton*, 407 So.2d 305, 307 (Fla. 4th DCA 1981). Damages awarded in specific performance are a way of compensation to adjust the equities between the parties to place them in a position that they would have occupied

had the contract been timely performed. [*Id.*] This court explained that "[t]he court is really requiring an accounting in its attempt to adjust the equities between both parties in order to return them to their relative position at the time of closing." *Id.* . . . .

Accordingly we reverse the trial court on the issue of damages and remand for an evidentiary hearing to determine the appropriate damages.

671 So.2d 832, 835 (Fla. 4th DCA 1996). This Court finds that under Florida law Plaintiff is entitled to a non-jury evidentiary hearing for this Court to determine appropriate damages incident to specific performance.

Furthermore, the Court notes that Plaintiff has requested, consistent with Florida law, that Qantum receive a reduction in purchase price commensurate with its damages, attorney's fees, and costs.[21] *See Boca Palm Invs., Inc. v. Jerdon Inc.*, 568 So.2d 505, 506–07 (Fla. 4th DCA 1990) (citing *Am. Realequities, Ltd. v. Alm Inv. Corp.*, 406 So.2d 507, 508–09 (Fla. 3d DCA 1981) (granting specific performance and reducing the purchase price by plaintiff's damages and attorney's fees)). Accordingly, this Court shall enter its final judgment and a final injunction requiring specific performance and requiring the parties to close on the Agreement after a hearing to determine the amount of damages.

### 7. It is unclear whether Plaintiff is entitled to attorney's fees under Article 16.2 of the Agreement

Plaintiff argues that they are entitled to attorney's fees and costs under the plain language of the agreement (D.E. No. 118 at 17–18; D.E. No. 117 at 16). Article

---

**21.** This Court discusses Plaintiff's entitlement to reasonable attorney's fees and costs as a sanction, *infra*.

16.2(a) of the Agreement states in relevant part:

> From and after the Closing, [Star] shall defend, indemnify and hold harmless Buyer from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses ("Damages") incurred by [Qantum] arising out of or resulting from: ... (ii) any breach or default by [Star] or [Hale] of any covenant or agreement under this Agreement ...

(D.E. No. 118, Exh. 2 at 7). This Court has already found that Defendants breached Article 8.9 and 8.1(e) of the Agreement. However, this Court is unclear whether Plaintiff is entitled to attorney's fees and costs that were incurred before closing because of the plain language "[f]rom and after closing." (D.E. No. 118, Exh. 2 at 7). However, it is unnecessary for this Court to reach that issue because it finds, *infra*, that Plaintiff is entitled to reasonable attorney's fees and costs in this action as a sanction for Defendants' misconduct.

## III. MOTION FOR SANCTIONS

### A. Standard of Analysis

The United States Supreme Court has held that in addition to the sanctions provisions in the Federal Rules of Civil Procedure and federal statutes, federal courts possess the inherent power to sanction parties and attorneys who conduct litigation in bad faith or who perpetrate fraud on the court.[22] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–51, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (involving a suit for specific enforcement of a contract for the purchase of a television station and subsequent bad faith acts of the station owner). The Supreme Court has cautioned that a "court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Id.* at 50, 111 S.Ct. 2123. However, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* The imposition of sanctions pursuant to a court's inherent authority serves the dual purpose of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." *Id.* (internal edits omitted) (citing *Hutto v. Finney*, 437 U.S. 678, 689, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)). The Supreme Court has held that sanctions such as dismissal and attorney's fees are within a court's inherent power when a party's conduct evidences bad faith and an attempt to perpetrate a fraud on the court. *See id.* at 40–46, 51, 111 S.Ct. 2123; (affirming an award of $996,644.65 in attorney's fees).

The Eleventh Circuit has explained that "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F.Supp.2d 1344, 1373 (S.D.Fla.2005) (striking defendant's affirmative defenses pursuant to the court's inherent powers) (citing *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir.2001) (sanctioning attorney who filed a frivolous lawsuit in bad faith for the purpose of extorting a settlement)). One court in the Southern District of Florida has explained: "Bad faith exists when the court finds that a fraud has been practiced upon it, or 'that the very temple of justice

---

**22.** There is no indication that Plaintiff is pursuing sanctions against any individual or entity other than Star Broadcasting, Inc. and Hale. Thus, this Court emphasizes that it is only considering the Motion for Sanctions as to the Defendants, as opposed to any attorneys who represented Star, including Timothy Brady.

has been defiled,' or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Allapattah,* 372 F.Supp.2d at 1373 (citing *Chambers,* 501 U.S. at 46, 111 S.Ct. 2123; *Malautea v. Suzuki Motor Co. Ltd.,* 987 F.2d 1536, 1545–46 (11th Cir.1993) (affirming district court's award of default judgment for violation of discovery orders, award of attorney's fees and costs, and additional fines under the court's inherent powers)).

As Plaintiff correctly observes, the inherent powers doctrine is most often invoked where a party commits perjury or destroys or doctors evidence. *See, e.g., Vargas v. Peltz,* 901 F.Supp. 1572, 1581–82 (S.D.Fla.1995) (dismissing Plaintiff's sexual harassment suit when it was revealed that the plaintiff had fabricated evidence and lied at a deposition); *Chemtall, Inc. v. Citi–Chem, Inc.,* 992 F.Supp. 1390, 1410 (S.D.Ga.1998) (finding by clear and convincing evidence that defendant had engaged in abusive conduct, including lying under oath, and finding that a lesser sanction would not suffice). Defendants emphasize that the Eleventh Circuit has explained that "false statements alone do not indicate bad faith," however, the Eleventh Circuit further explained in the case cited by Defendants, that "[a] false statement can be evidence of bad faith, if, for instance, there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose." *Byrne v. Nezhat,* 261 F.3d 1075, 1125 (11th Cir.2001). Furthermore, several federal courts have held that the need

for sanctions is heightened when the misconduct relates to the pivotal or "linchpin" issue in the case. *See, e.g., Vargas,* 901 F.Supp. at 1582; *Nichols v. Klein Tools, Inc.,* 949 F.2d 1047, 1049 (8th Cir.1991) (dismissing plaintiff's claims after he "repeatedly and pointedly lied under oath regarding the pivotal issue in [the] case").

Perhaps most relevant to the instant case, one court in the Southern District of Georgia struck defendants' answers and entered default judgments after a defendant repeatedly lied under oath at his deposition and produced misleading documents in an effort to hinder plaintiff's efforts to collect a debt. *Chemtall, Inc.,* 992 F.Supp. at 1406–10. To prove the defendant's deception, the plaintiff conducted third-party discovery and confronted the defendant with documents that contradicted his previous testimony. *Id.* at 1409. That court observed that "a district court may use its inherent power to enter a default judgment only if it finds, first, by clear and convincing evidence—a preponderance is not sufficient—that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.' "[23] *Id.* at 1408 (internal citations omitted) (citing *Richardson v. Union Oil Co. of California,* 167 F.R.D. 1, 4 (D.D.C.1996), *modified in part,* 170 F.R.D. 333, 334–35 (D.D.C. 1996)). That court then granted plaintiff's request that it "unsheath the [proverbial] Samurai Sword" by entering a default judgment against the defendant

---

**23.** The court in *Chemtall, Inc.* relied heavily on a D.C. Circuit opinion which explained: "After finding the existence of serious and repeated instances of litigation misconduct, the Court must then 'calibrate the scales' in determining what sanction corresponds to the misconduct and whether a sanction less than the draconian one of default would 'sufficient-

ly punish and deter the abusive conduct while allowing a full and fair trial on the merits.' " *Richardson v. Union Oil Co. of California,* 167 F.R.D. 1, 4 (D.D.C.1996), *modified in part,* 170 F.R.D. 333, 334–35 (D.D.C.1996) (citing *Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1472–73 (D.C.Cir.1995)).

after finding by clear and convincing evidence that he had engaged in abusive behavior, and also finding that a lesser sanction would not suffice. *Id.* at 1407–10.

### B. Discussion

█ Plaintiff's Motion for Sanctions and the incorporated exhibits include a significant amount of evidence that indicates that Defendants have engaged in a pattern of misconduct during the course of this litigation. This Court now considers Plaintiff's allegations that: 1) Hale lied under oath regarding the key issue in this case; 2) that Defendants failed to produce key "smoking-gun" documents during discovery; and 3) that Defendants made a bad-faith bankruptcy filing to avoid this litigation and the Agreement. For the reasons discussed *infra,* this Court finds that there is clear and convincing evidence that Defendants engaged in a pattern of abusive misconduct *Chemtall, Inc.,* 992 F.Supp. at 1408. Furthermore, this Court concludes that no sanction less than default judgment and reasonable attorney's fees and costs would "sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits." *See Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1472–73 (D.C.Cir.1995).

### 1. Hale lied under oath regarding the key issue in this case

Plaintiff argues that there is clear and convincing evidence that Defendant Hale lied under oath regarding communications between Star and Cumulus about the purchase of WTKE. *See* (D.E. No. 117 at 4; Transcript for Hearing on Motion for Summary Judgment and Sanctions at 12:1–9; 34:6–16). This Court agrees. At his July 21, 2005 deposition Hale testified that Defendants interpreted the Agreement to expire by its own terms on March 5, 2005.[24] As Plaintiff correctly indicates, Hale repeatedly testified that neither he nor anyone else had approached Cumulus about a WTKE deal until after March 7, 2005. Most notably, at his video deposition Hale testified:

> [Plaintiff's Counsel]: Starting with the moment that you signed the Qantum/TKE deal .... and moving all the way forward to early March, when was the first moment that you convey[ed], either directly or through your attorneys, to Cumulus that you would be interested in selling TKE to them?
>
> [HALE]: March 7th.
>
> [PLAINTIFF'S COUNSEL]: Okay. Is that your sworn testimony.
>
> [HALE]: That is my *sworn testimony.*[25]
>
> [PLAINTIFF'S COUNSEL]: All right.
>
> [HALE]: That is the best recollection I have.

(Depo. Hale. Tr. at 54:25–55:1); *see also id.* at 79:5–79:13; 24; 22–25:8 (stating that "[a]ny discussions with Cumulus [prior to March 3, 2005] were simply that we needed funds to close it with Clear Channel"); 59:16–60:1 (testifying that the earliest he spoke with Cumulus was in January 2005, and only *regarding the sale of WPPG*); 79:5–80:10 (reiterating that March 7, 2005 was the first time Defendants discussed

---

**24.** Plaintiff notes in its Motion for Sanctions that the Agreement did not expire on its own terms on March 5, 2005, but, rather, it required a written notice of termination pursuant to Section 17.1. (D.E. No. 117 at 4 n. 2). This Court agrees with Plaintiff's interpretation of the agreement.

**25.** In addition to carefully reviewing the written transcript of Hale's deposition, this Court has also observed relevant portions of the video deposition of Ronald Hale at the preliminary injunction hearing and at the hearing on motions for summary judgment and sanctions. This Court notes that there was a distinct emphasis on the words "sworn testimony" by Hale.

the deal with Cumulus after the execution of the Agreement).

Plaintiff argues that a number of documents directly contradict Hale's deposition testimony. (D.E. No. 117 at 5). This Court agrees. As is discussed in the context of the Motion for Summary Judgment, *supra*, there is a substantial body of documentary and deposition testimony evidence that shows that Hale approached Cumulus in October of 2004. *See, e.g.*, (D.E. No. 118, Comp. Exh. 3; D.E. No. 132, Exh. C (Depo.Dickey) at 8:19–9:17 (testifying that Hale contacted Dickey about the possibility of a deal involving three radio stations including WTKE)). Furthermore, an email dated June 20, 2005 from Timothy Brady (Star's FCC counsel) to Lew Paper (Cumulus' FCC Counsel) indicates that Defendants tried to convince Cumulus to help conceal, or at least minimize, available information regarding the timing of the negotiations between Cumulus and Star from Qantum. Brady wrote:

> The FCC is not interested in when various discussions took place. Qantum is very interested. They know that logically we had to be discussing the transactions before we entered into the agreements, but they have no idea when those discussions took place or whether they were before or after March 5th. We do not want them to tell them that, as having that fact might increase the chance they will file some action against Star and/or Cumulus.

*See* (D.E. No. 117, Exh. 4) (discussing a draft FCC filing and suggesting that certain factual recitations from that draft filing be deleted).

In response, Defendants rely heavily on an affidavit of Hale that attempts to put the statements made at is video deposition in context, noting: "I understand how portions of the Emails and my deposition testimony appear to be in conflict" and "I did not lie under oath." (D.E. No. 125, Exh. B at ¶ 10.) As Plaintiff observes, Defendant essentially advances two main arguments regarding the issue of his false testimony: 1) that any false testimony was not deliberate and reflected his best recollection at deposition that occurred "during expedited discovery" for which he had only "2–3 hours to prepare;" and 2) that in Hale's mind communications with Cumulus did not amount to shopping in breach of the No–Shop Provision. *See* (D.E. No. 132 at 2; D.E. No. 125, Exh. B at ¶¶ 6, 7,10). This Court finds that these arguments are unpersuasive.

In terms of the argument presented in Hale's affidavit that he did not have time to adequately prepare for his deposition, or that he did not have access to the relevant emails, this Court finds those assertions to be contrary to a large body of undisputed evidence. A May 6, 2005 letter from John Pelkey (counsel for Qantum) to Hale accused Star of breaching the No–Shop Provision and put Defendants on notice that "discussions and negotiations concerning the sale of WTKE and its assets with Cumulus" were an important legal issue. (D.E. No. 132, Exh. A). Furthermore, as Plaintiff emphasizes, a June 9, 2005 letter from John O'Sullivan (Plaintiff's counsel in this litigation) to Hale requested that Hale provide the date of his first contact with any other party concerning the purchase of WTKE and that Star and Hale "confirm in writing that they will take all steps necessary to preserve all information and documents." *Id.* at Exh. B. It was later, on June 20, 2005, that Timothy Brady wrote an email to Cumulus about either concealing or minimizing the information available about the timing of discussions between Star and Cumulus. (D.E. No. 117, Exh. 4). Plaintiff argues:

> By the time Hale finally got the question in his deposition[,] he had been thinking about the timing of his discussions with Cumulus regarding WTKE for months.

He knew that admitting to negotiations before March 5, 2005 would put him in breach of the No–Shop and probably cause him to lose this lawsuit. Hale's false testimony was not the product of his being unprepared for the key questions at his deposition. He was very prepared. And he deliberately chose to give false testimony on a point where he knew the truth would hurt his case.

(D.E. No. 132 at 3). This Court notes that Hale's argument that he was unprepared for his deposition is inconsistent with the documentary and testimonial evidence in this case. Furthermore, as Plaintiff observes, it is highly suspect that the argument and factual assertions regarding Hale's lack of time to prepare or lack of access to relevant documentary evidence were not made in the context of the preliminary injunction hearing. *See* (D.E. No. 132 at 4); (Injunction Hearing Transcript D.E. No. 118, Exh. 5 at 13:11–14) ("For purposes of this argument, I am conceding that we are in violation of the no solicitation clause .... I do not want to dispute those facts.")

Defendants' second major argument against a perjury sanction, which is essentially a legal argument that is contained in Hale's affidavit, is that the discussions with Cumulus did not amount to negotiations. Hale's affidavit explains that he viewed the communications with Cumulus starting in October of 2004 as "preliminary, exploratory comments, sort of allowing the parties to 'kick the tires' on our car."[26] This Court agrees with Plaintiff that Hale's subjective beliefs about whether or not the discussions amounted to negotiations is irrelevant. Hale flatly denied having *any* communications with Cumulus about acquiring WTKE between the signing of the Agreement until after March 5. After carefully reviewing all the evidence filed in this case, and carefully considering the parties legal arguments, this Court finds by clear and convincing evidence that Hale deliberately gave false testimony as to when discussions with Cumulus occurred.

### 2. Defendants failed to produce documents about the key issue in this case

Plaintiff also argues that Defendants failed to produce key "smoking-gun" documents during discovery. Plaintiff explains that after this Court issued a temporary restraining Order and set a preliminary injunction hearing, the parties conducted expedited discovery. (D.E. No. 132 at 3). Plaintiff explains that in response to a Qantum subpoena, Defendants produced hundreds of documents, however "[s]uspiciously, none of them predated March 2, 2005." *Id.* Later, Plaintiff was able to obtain third-party discovery from Cumulus that included a number of emails predating March 2, 2005 that were either sent or received by Hale or Star's attorney Timothy Brady. *See* (D.E. No. 117, Comp.Exh. 5).

In addition, these emails included term sheets exchanged between Defendants and Cumulus prior to March 5, 2005 that reflected initial terms of a deal involving WTKE assets. *Id.* at Exh. 6 (Plaintiff's Exhibit 86) ("Overview of the Star/Cumulus Deal" sent to Cumulus by Hale on February 15, 2005); *id.* at Exh. 7 (Plaintiff's Exhibit 98) (outline of the Star/Cumu-

---

26. Hale also attempts to justify these actions on the basis that the "handwriting was on the wall" that FCC approval of the exchange with Clear Channel would not be timely. (D.E. No. 125, Exh. B at ¶ 7). Furthermore, Hale states that "[t]here was absolutely nothing that either Defendants did or did not do that prevented or delayed the FCC approval before the termination of the WTKE Purchase Agreement." *Id.* at ¶ 8. This Court finds that argument is essentially a reiteration of Defendants' materiality arguments, which this Court has already discussed, *supra.*

lus deal sent to Cumulus by Brady on March 2, 2005); *id.* at Exh. 8 (Plaintiff's Exhibit 105) (draft by Cumulus prior to March 7, 2005). As Plaintiff correctly notes, Defendants did produce the cover email to one of the term sheets but not the attached outline of terms. *See id.* at Exh. 7 (Plaintiff's Exhibit 98). During Hale's deposition, he testified that it did not relate to WTKE. (Depo. Hale at 42:13–43:2). The attachment associated with that email, which was later produced by Cumulus, directly contradicted Hale's testimony.

In response Defendants argue that "[a]s a part of an ongoing business practice, Hale regularly purged his emails due to the limited amount of storage space his email service provided and it was the practice of Star and Hale not to print or save copies of the email messages received or sent by Hale." (D.E. No. 125 at 5). Defendants further explain that "Hale did not have the Emails prior to his deposition to refresh his memory and all testimony was given to the best of his un-refreshed memory." *Id.* Furthermore, Defendants opine that "Qantum's argument that the Defendants intentionally failed to produce the Emails in order to conceal them from Qantum defies logic since the Defendants knew that Qantum would be obtaining document production from other non-party witness [sic] and any such records would still likely be available to Qantum through these non-party witnesses." *Id.* In support of these arguments, Defendants included an affidavit from Hale and from John Finch, Star's "Management Consul-

tant." [27] Again, this Court notes that the explanation regarding the emails was not offered at any point prior to the filing of the Motion for Sanctions, including at the extensive preliminary injunction hearing.

Perhaps most surprisingly, Defendants argue that Plaintiff was not prejudiced as a result of the failure to produce the key documents. Defendants argue: "[w]ithin days of Hale's deposition and in time for the Cumulus deposition and the August 3, 2005 hearing on the preliminary injunction, Cumulus had received the [e]mails from the non-party witnesses," and that "Qantum utilized the [e]mails at the depositions of non-party witness … [and] in support of its position at the August 3 hearing." *Id.* at 6–7. Defendants further emphasize that, notwithstanding the alleged misconduct, Plaintiff successfully obtained a preliminary injunction.

This Court disagrees with Defendants' contention that the failure to produce key documents did not prejudice Plaintiff. As Plaintiff correctly notes, as a result of Defendants' actions, Plaintiff has had to expend significant time and money proving Defendants' breach of the Agreement. Plaintiff had to propound discovery on Cumulus and depose Cumulus' CEO, Lew Dickey, and general counsel, Richard Denning. Furthermore, Defendants' failure to produce the key documents had an enormous risk of substantial prejudice, especially when viewed in the context of Defendants' argument in opposition to the entry of a preliminary injunction. Defendants

**27.** Plaintiff's Reply Memorandum in support of sanctions notes:

> In addition to being a "Management Consultant," Finch is Star's Chief Financial Officer. Upon information and belief, Finch is the uncle of Hale's wife. He was a member of Star Tower LLC before Hale sold that company. And he was the single largest unsecured creditor in the bankruptcy of another Hale company, Gulf Breeze

> Media, Inc. Finch wears many hats at Star, and can hardly be described as a disinterested affiant.

While this Court finds that Plaintiff's argument raises an interesting issue, it does not rely on Plaintiff's allegation of Finch's improper motive for the purposes this Order, nor for its ultimate conclusion that an award or sanctions is appropriate.

argued: "Qantum has not even made a showing that the negotiations with Cumulus regarding WTKE occurred prior to March 5, 2005, much less a showing of likelihood of success of proving it." (D.E. No. 26 at 15). Accordingly, after carefully reviewing the record in this case as a whole, this Court finds by clear and convincing evidence that Defendants deliberately failed to produce key documents and that this failure prejudiced Plaintiffs.

### 3. Defendants filed a bad-faith bankruptcy petition in order to avoid this litigation

On September 27, 2005 this Court set this case to go to trial during the calendar period commencing on February 6, 2006. (D.E. No. 70). Shortly thereafter, on October 17, 2005, Defendants' attorneys sought leave to withdraw as counsel. (D.E. No. 78). This Court granted that motion on October 31, 2005 and required Defendant Star Broadcasting to secure counsel by November 11, 2005. (D.E. No. 81). The Court further ordered that Defendant Hale had until November 11, 2005 to secure counsel or file a notice of intent to proceed *pro se*. *Id.* Defendant Hale filed a notice of intent to proceed *pro se* on November 10, 2005. (D.E. No. 89). However, Defendant Star filed for Chapter 11 relief in the Bankruptcy Court for the Northern District of Florida on November 10, 2005. *See* (D.E. No. 94). This action resulted in an automatic stay which stalled the instant litigation and an associated appeal filed by Defendants in the Eleventh Circuit Court of Appeals.

On December 7, 2005 Qantum moved to dismiss the bankruptcy action. *See id.* On January 20, 2006 Plaintiff filed a notice of the "Order on Qantum Communication's Motion for Relief From Automatic Stay and Motion to Dismiss" issued by the Bankruptcy Court for the Northern District of Florida. (D.E. No. 101). The Bankruptcy Court held an all-day eviden-

tiary hearing on Qantum's motions on January 3, 2006. *See* (Plaintiff's Notice of Filing D.E. No. 101 ("Bankruptcy Court Order")). Both Hale and Timothy Brady gave live testimony at that hearing. On January 20, 2006 the Bankruptcy Court issued an order lifting the automatic stay and holding that Star's bankruptcy was merely a "litigation tactic" to avoid the litigation before this Court, to reject the Agreement, and to sell WTKE to Cumulus. The Bankruptcy Court explained:

> The Debtor's strategy in this case was simple. The Debtor would file its motion to reject the [Agreement], halt the district court litigation and the Eleventh Circuit appeal by virtue of the automatic stay and seek to have the bankruptcy court ultimately approve this through a plan of reorganization. At the first meeting of creditors the Debtor clearly stated that the sole reason for filing a Chapter 11 was to avoid the [Agreement] .... The Court concludes that based on the timing of the filing of the petition, the Debtor's own schedules showing an equity position of over $5 million in assets over liabilities, the attempt to circumvent pending litigation and the attempt to reject what the Debtor perceived as an unprofitable contract constitutes bad faith in this case and that "cause" exits under § 362(d)(1) to lift the automatic stay.

(Bankruptcy Court Order at 9, 12). Furthermore, the Bankruptcy Court commented: "This Court has observed Hale as a witness and his demeanor on the stand and concludes that his responses to certain questions have been evasive, contradictory and not credible." *Id.* at 10–11. The Court also found that the testimony of Star's FCC counsel, Timothy Brady, strained credibility. *Id.* at 11.

When considering sanctions, a district court may consider all the circumstances

surrounding the alleged violations, including a party's misconduct in related cases. *Atkins v. Fischer,* 232 F.R.D. 116, 129–31 (D.D.C.2005) (citing *Link v. Wabash R.R. Co.,* 370 U.S. 626, 635, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)); *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.,* 38 F.3d 1414, 1417–18 (5th Cir.1994) (affirming award of sanctions when district court considered collateral bankruptcy proceedings in its sanctions order); *see also Johnson v. Comm'r of Internal Revenue,* 289 F.3d 452, 456–57 (7th Cir.2002) (holding that the tax court would be "remiss not to consider" the party's bad conduct in other cases). The Bankruptcy Court also found:

> This Chapter 11 is Mr. Hale's second attempt to avoid selling a radio station to Qantum. The first attempt was the Gulf Breeze Media, Inc. Chapter 11, in which the Debtor sought to reject the contract to sell the station to Qantum in order to make more profit by selling the station to another purchaser .... Now Mr. Hale has placed Star Broadcasting into a Chapter 11 with the same idea of rejecting the contract with Qantum in order to sell to another purchaser for more money.

(Bankruptcy Court Order at 9).

This Court finds that Defendants' conduct related to the filing of the bankruptcy, when examined in the context of documentary evidence, such as the December 16, 2004 email from Hale to Denning that proposes to "blow up" the WMMK bankruptcy to avoid a provision of the WTKE Agreement requiring Star to provide Qantum with access to WTKE prior to closing, as well as the findings of the Bankruptcy Court, constitutes clear and convincing evidence of a bad faith scheme to abuse of the bankruptcy system to avoid this litigation and the Agreement. This Court also finds that the Defendants' bankruptcy filing further evidences Defendants' lack of respect for courts and the judicial process.

### 4. This Court finds that Defendants engaged in an unconscionable scheme that prejudiced Qantum

Defendants argue that "[t]here is absolutely no evidence of a scheme to lie at deposition and to destroy records in order to interfere with court or unfairly hamper the presentation of Qantum's claim." (D.E. No. 125 at 6). This Court disagrees. The documentary evidence, which remains undisputed, evidences a plan to conceal the negotiations between Star and Cumulus from Qantum.

Most notably, in an email from Timothy Brady (Star's FCC counsel) to Lew Paper (Cumulus' FCC counsel), Brady discusses his intent "to keep the account accurate while reducing the amount of new information [Cumulus was] providing Qantum." (D.E. No. 117, Exh. 4) (discussing an FCC filing and suggesting that certain factual recitations from that filing be deleted). Furthermore, Brady's email further explains: "They know that logically we had to be discussing the transactions before we entered into the agreements, but they have no idea when those discussions took place or whether they were before or after March 5th ... [w]e do not want to tell them that." *Id.*

Later, in an email dated April 14, 2005, Brady stated:

> Star gave written notice to Qantum today by fax that the [Agreement] is terminated. The original and necessary copies are being delivered tomorrow morning by Fed Ex.

> Since one could interpret the [Agreement] such that the effective date of termination is the day the copies of the notice are received, i.e., Friday, would it be possible to have the documents dated Saturday, 4/16/05, instead of Friday?

> I prefer the date on the documents to be at least one day following termination Obviously, the documents can be physi-

cally signed and overnighted Friday, but dated 4/16/06.

(D.E. No. 132, Exh. D). This Court notes that the record indicates that Cumulus agreed to this suggestion. *See id.* In response to Brady's email, Brooks Milling from Cumulus noted: "You are asking someone who has never seen (and does not want to see) the Qantum documents," and "I see no problem with the time change." *Id.* This evidence, when viewed in the context of the undisputed documentary evidence detailing a plan to sell Cumulus in contravention of a clear No–Shop Provision, the failure to produce key documents, Hale's sworn testimony denying any communications with Cumulus about a deal for Cumulus to acquire WTKE assets, and the associated Chapter 11 filing that was later found to be in "bad-faith," is clear and convincing evidence of an unconscionable scheme on the part of Defendants to avoid the agreement at any and all costs.

This Court agrees with Plaintiff's argument that Qantum has been prejudiced by having to expend substantial resources in an attempt to undo the harm done by Defendants' actions. *See* (D.E. No. 132). One district court in the Eleventh Circuit that granted the ultimate sanction of striking Defendants' answers and entering default judgments explained:

> "Ultimate sanction" cases ultimately rest upon the conviction that no lesser sanction will prevent the offending litigant from continuing to lie or distort the truth so pervasively that it "prevent[s] the opposing party from fairly presenting his case or defense." Use of the "ultimate sanction" addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of courts, which otherwise "cannot command respect if they cannot maintain a level playing field amongst participants."

Those who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up, as *in this case*, consuming substantial resources to respond to and "undo" the victimizer's lies and distortions. Here plaintiffs did just that by resorting to third party discovery, then confronting King with contradictory documents, and even his own testimonial contradictions. Rather than confront the Cobb, Miller and Stackhouse deposition/affidavit testimony showing that King defrauded plaintiffs and lied under oath (e.g., by submitting an additional affidavit denying the otherwise damning facts to which they testified), King simply moved, on technical grounds, to exclude their testimony, citing facially inapposite case law. His silence and ultimately futile litigational response speak volumes. In the meantime, the Court itself is prevented from actually reaching the merits of the case-as well as resolving other cases-by having to stop and, as it has done here, exhaustively examine what is, at bottom, sanctionable perjury and fraud upon the Court.

*Chemtall, Inc. v. Citi–Chem, Inc.,* 992 F.Supp. 1390, 1409–10 (S.D.Ga.1998) (internal citations omitted). This Court finds that the Southern District of Georgia Court's reasoning is persuasive. This Court agrees with Plaintiff's contention that it is still dealing with the aftermath of Defendants' actions, which have been further compounded by outrageous and untenable positions such as those contained in Defendants' affidavits. This Court finds the assertions that Defendant only had two to three hours to prepare for his deposition and that Hale testified to the "best of his recollection" are preposterous. This case ultimately turns on a relatively straightforward issue of contract interpretation. However, Defendants' bad faith

actions during the course of this litigation have led the parties on an odyssey from this Court, to Bankruptcy Court, and back. Furthermore, these bad faith actions have unnecessarily complicated the instant litigation and required the expenditure of considerable judicial resources.

In summary, this Court concludes that Defendants engaged in an "unconscionable scheme calculated to interfere with the judicial system's ability [to] impartially . . . adjudicate a matter by . . . unfairly hampering the presentation of the opposing party's claim" and that Plaintiff is entitled to the entry of default judgement as to liability on all counts.[28] *See Vargas,* 901 F.Supp. at 1579; *Chemtall, Inc.,* 992 F.Supp. at 1410. After carefully reviewing the parties' arguments and the entire record in this case, this Court concludes that there is clear and convincing evidence of the following instances of misconduct: 1) Defendant Hale lied under oath during his deposition; 2) Defendants sought to mislead Plaintiff by failing to disclose key documents in response to comprehensive discovery request; 3) Defendants acted in bad faith to stall this litigation and an Eleventh Circuit appeal and they abused the bankruptcy process; and 4) Defendants have further compounded this litigation by outrageous and untenable positions.

5. **No sanction less than default judgment and reasonable attorney's fees and costs would sufficiently punish and deter the abusive conduct while allowing a fair trial on the merits**

After careful consideration, this Court concludes that no sanction less than default judgment as to liability for all counts of the Amended Complaint and an award of reasonable attorney's fees and costs would "sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits." *See Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1472–73 (D.C.Cir.1995) ("After finding the existence of serious and repeated instances of litigation misconduct, the Court must then 'calibrate the scales' in determining what sanction corresponds to the misconduct and whether a sanction less than the draconian one of default would 'sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.' "). With regard to the judicial concern that parties be entitled to a "full and fair trial on the merits," this Court emphasizes that it has already considered Plaintiff's Motion for Summary Judgment and found that Plaintiff is entitled to judgment on the merits as to liability for Count I, Count III, and Count IV.

In light of this fact, a calibration of the "scales" indicates that the harsh sanction of default is especially appropriate in order to sufficiently punish and deter Defendants' abusive conduct. *See id.* Indeed, this Court notes that the practical effect of its decision to award default judgment is that the decision: 1) serves as an alternative basis for this Court's judgment as to liability for Count I, Count III, and Count IV; 2) serves as a basis for the award of attorney's fees and costs; and 3) serves as the basis for judgment as to liability for Count II (Breach of Contract) of Plaintiff's Amended Complaint. In other words, Defendants have already been afforded a fair trial on the merits pursuant to Federal Rule of Civil Procedure 56 as to Counts I, III, and IV. This Court finds that default judgment as to the only remaining count, Count II, is necessary to sufficiently punish Defendants and discourage future mis-

---

**28.** This Court emphasizes that this holding applies to Count II of the Plaintiff's Amended Complaint, in which Plaintiff seeks damages for breach of contract relating to an option to purchase Star Tower, LLC from Defendants.

conduct by the Defendants and other parties.

Furthermore, this Court notes that Defendants' misconduct was closely intertwined with the merits of the case. At oral argument, Plaintiff emphasized the severity of the misconduct when it relates to a key issue in the case.[29] This Court agrees with this observation. Indeed, the misconduct related to Hale's testimony and Defendants' failure to produce evidence related to the pivotal or "linchpin" issue in this case, a factor which militates heavily in favor of the severe sanction of default. *See Chemtall, Inc.*, 992 F.Supp. at 1410; *Vargas*, 901 F.Supp. at 1582. The interference on the part of Defendants hampered the ability of Plaintiff to present its claim on the central issue of this case, which was whether Defendant breached the No-Shop Provision by negotiating to sell the WTKE assets to Cumulus while the Agreement between Qantum and Star was in place. Plaintiff argues that "Star and Hale should not escape sanctions just because Qantum was fortunate and diligent enough to uncover Defendants' scheme in time to present it to the Court at the injunction hearing." (D.E. No. 125 at 15). This Court agrees.

Defendants attempted to obtain judicial relief based upon fraudulent means. As the district court in *Vargas* observed: "Litigants must know that the courts are not open to persons who would seek justice by fraudulent means." *Vargas*, 901

F.Supp. at 1582. "Use of the 'ultimate sanction' addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of courts, which otherwise 'cannot command respect if they cannot maintain a level playing field amongst participants.' " *Chemtall, Inc.*, 992 F.Supp. at 1409 (citing *Derzack v. County of Allegheny, Pa.*, 173 F.R.D. 400, 414 (W.D.Pa.1996)). The evidence in this case, as well as the findings of the Bankruptcy Court that Defendants filed a bad-faith bankruptcy in order to stall this litigation and the appeal pending before the Eleventh Circuit, demonstrates a clear pattern of disregard for the integrity of the judicial system on the part of the Defendants. Accordingly, the severe sanction of default judgment is appropriate because it helps vindicate the judicial system as a whole. *See Chemtall, Inc.*, 992 F.Supp. at 1409–10; *see also Allapattah*, 372 F.Supp.2d at 1373; *Malautea*, 987 F.2d at 1545–46.

As noted *supra*, because the Plaintiff has requested a reduction in purchase price that reflects damages, this Court shall enter its final judgment and a final injunction requiring specific performance and requiring the parties to close on the Agreement after determination of damages. As is ordered *infra*, the parties shall confer in good faith and determine whether they are able to reach an agreement as to the nature of the proceeding to determine damages as to Count II.[30]

---

**29.** Plaintiff's counsel stated at oral argument:

> I mean this is not a criminal case. We are dealing with civil sanction rules. And within that framework, this is the worst thing you can do. I mean, what else can you do in a civil case other than lie on the key points, try to take the product of the case through perjury.

(D.E. No. 162, Transcript of Hearing on Motion for Summary Judgment and Sanctions at 12:1–5).

**30.** This Court notes that as a sanction, it has determined that Plaintiff is entitled to judgment as to liability for all counts of the Amended Complaint, including Count II. In the event that the parties are unable to agree on the nature of the proceeding to determine damages pursuant to Count II, the parties' memorandums shall address the issue of whether a right to a jury trial *as to damages* attaches to Count II of the Amended Complaint in light of this Court's default judgment as a sanction.

For these reasons, it is hereby:

**ORDERED AND ADJUDGED** that

1. Plaintiff's Motion for Partial Summary Judgment as to Liability (**D.E. No. 118**) is **GRANTED**, consistent with the findings of this Order.

2. Plaintiff's Motion for Sanctions, Including the Entry of a Default Judgment and an Award of Attorney's Fees (**D.E. No. 117**) is **GRANTED**, consistent with the finding of this Order.

3. The parties shall confer on or before *February 20th, 2007* and work in good faith to reach consensus as to the format and times of the hearing and/or hearings to determine: 1) damages incident to specific performance; 2) reasonable attorney's fees and costs; and 3) damages pursuant to Count II of the Amended Complaint.

4. On or before *Tuesday March 6, 2007 at 4:30 p.m.* the parties shall file a joint status report. This report shall state whether the parties were able to reach any agreement as to the format of the proceedings discussed in ¶ 3 of this Order, *supra*, and shall state what the parties were able to agree to, if anything.

5. In the event that the parties are unable to reach an agreement on the matters discussed in ¶ 3 of this order, *supra*, on or before *Tuesday, March 6, 2007 at 4:30 p.m.* Plaintiff and Defendants (i.e. Star and Hale combined) shall each separately file a memorandum *that shall not exceed 6 pages* (excluding the certification page) that addresses that party's proposal as to how to proceed with determining the damages and attorney's fees and costs discussed in ¶ 3 of this Order and the legal basis for that proposal.